UNITED STATES of America, Appellee,

v.

Marcos Loinas ANDERSON, a/k/a Marcos Loynas Anderson, a/k/a T. Torrero, a/k/a Samuel Perez, Appellant.

UNITED STATES of America, Appellee,

v.

Maria BERDECIA, a/k/a Maria C. Depalacio, a/k/a Consuela, Appellant.

UNITED STATES of America, Appellee,

v.

Norberto GARCES, a/k/a Victorio Torres, Piro, Appellant.

UNITED STATES of America, Appellee,

v.

Gabriel Ruperto DAVIS–MUNOZ, a/k/a Gabriel Davis, Gabelin, Appellant.

UNITED STATES of America, Appellee,

v.

Alfredo BRATHWAITE, a/k/a Sealy, Alfredo West, Freddie, Appellant.

UNITED STATES of America, Appellee,

v.

Beverly Elaine NELSON, a/k/a Beverly M. Nelson, Appellant.

UNITED STATES of America, Appellee,

v.

Robert Luis CASTILLO, a/k/a Robert Luis Castillo–Garrido, Appellant.

UNITED STATES of America, Appellee,

v.

Antonio SCOTT, a/k/a Tony Anderson, Tony, Appellant.

---

UNITED STATES of America, Appellee,

v.

Leonard Lancelot SHAND,
a/k/a Steve, Appellant.

UNITED STATES of America, Appellee,

v.

Vielka DUDLEY, a/k/a Vielka Dudley–
Maynard, Vielka Davis, Benky,
Appellant.

UNITED STATES of America, Appellee,

v.

Antonio SCOTT, a/k/a Tony Anderson,
Tony, Appellant.

UNITED STATES of America, Appellee,

v.

Michael Jonathan BOOZE, Appellant.

UNITED STATES of America, Appellee,

v.

Thomas Timothy BOOZE, a/k/a
Timmy, Appellant.

UNITED STATES of America, Appellee,

v.

Gregory Orlander BOOZE, Appellant.

Nos. 90–3041, 90–3044 to 90–3048, 91–3030,
91–3075, 91–3077, 91–3103, 90–3200, 90–
3131, 90–3154 and 91–3003.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 17, 1993.

Decided Oct. 18, 1994.

As Amended Oct. 18, 1994.

Rehearing and Suggestion for Rehearing
In Banc Denied Dec. 22, 1994
in No. 90–3154.

Rehearing and Suggestion for Rehearing
In Banc Denied Jan. 10, 1995
in No. 90–3047.

Rehearing Denied Feb. 9,
1995 in No. 90–3041*.

Order Granting Rehearing In Banc and
Vacating Judgment Feb. 9, 1995
in No. 90–3041.

* Silberman, Circuit Judge, would grant the petition for rehearing.

William S. Rhyne (appointed by the Court) argued the cause and filed the brief, for appellant Maria Berdecia.

Achim Kriegsheim (appointed by the Court) argued the cause, for appellant Michael Jonathan Booze. On the joint brief were Diane S. Lepley, for appellant Gregory Orlander Booze and Lois R. Goodman, for appellant Thomas Timothy Booze.

David C. Niblack (appointed by the Court) argued the cause and filed the brief, for appellant Robert Luis Castillo.

Dennis M. Hart (appointed by the Court) argued the cause and filed the brief, for appellant Marcos Loinas Anderson.

Lois R. Goodman (appointed by the Court) argued the cause and filed the brief, for appellant Thomas Timothy Booze.

Robert W. Mance (appointed by the Court) argued the cause and filed the brief, for appellant Gabriel Ruperto Davis–Munoz.

G. Godwin Oyewole (appointed by the Court) argued the cause and filed the brief, for appellant Leonard Lancelot Shand.

David Carey Woll (appointed by the Court) argued the cause and filed the brief, for appellant Alfredo Brathwaite.

Thomas Abbenante (appointed by the Court) argued the cause and filed the brief, for appellant Vielka Dudley.

Richard S. Stern (appointed by the Court) argued the cause and filed the brief, for appellant Antonio Scott.

W. Gary Kohlman argued the cause and filed the brief, for appellant Beverly Elaine Nelson.

Michael J. McCarthy (appointed by the Court) argued the cause and filed the brief, for appellant Norberto Garces.

Diane Lepley (appointed by the Court) argued the cause and filed the brief, for appellant Gregory Orlander Booze.

Stephen J. Pfleger and James C. Bohling, Asst. U.S. Attys., argued the cause, for the appellee. On the brief were J. Ramsey Johnson, U.S. Atty. at the time the brief was filed, and John R. Fisher and Margaret R. Batten, Asst. U.S. Attys. Elizabeth Trosman, Asst. U.S. Atty., entered an appearance.

Before: SILBERMAN, GINSBURG, and HENDERSON, Circuit Judges.

Opinion filed PER CURIAM.

Opinion dissenting in part filed by Circuit Judge SILBERMAN.

PER CURIAM:

The appellants were convicted of and sentenced on various drug offenses, all related to an extensive cocaine distribution network organized and managed by appellant Anderson, a Washington, D.C. area resident. For a period of years, Anderson purchased cocaine from several suppliers in Washington, New York and California and resold it to both wholesale distributors and street level dealers, primarily through five "distribution centers" located in Washington, Maryland and Virginia.[1] According to the government, appellants Berdecia, Garces, Dudley, Davis and Brathwaite were among the various individuals who supplied, or attempted to supply, Anderson with cocaine at one time or another; appellants Thomas Booze, Gregory Booze, Michael Booze[2] and Brathwaite purchased cocaine from Anderson for further distribution; and appellants Castillo, Shand and Scott worked in Anderson's distribution centers. Appellant Nelson, Anderson's girlfriend, relayed messages between other conspirators and Anderson.

The thirteen appellants, along with 18 alleged co-conspirators, were indicted in a 126-count superseding indictment filed June 23, 1989. The trial judge divided the defendants into three groups for three separate trials (hereafter referred to collectively as "Group I," "Group II" and "Group III" defendants).[3] Each of the appellants was convicted of one count of conspiring to distribute and to possess with intent to distribute cocaine in violation of 21 U.S.C. § 846 and of one or more counts of using a telephone to facilitate a drug transaction in violation of 21 U.S.C. § 843(b). In addition, appellants Anderson, Thomas Booze, Brathwaite, Davis and Dudley were convicted of possessing on at least one occasion some quantity of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a) and appellants Anderson and Thomas Booze were convicted of traveling interstate in aid of racketeering activities in violation of 18 U.S.C. § 1952(a). Appellant Anderson was also convicted of distributing cocaine in violation of 21 U.S.C. § 841(a), carrying and using a firearm in relation to a drug trafficking offense in violation of 18

---

1. The "distribution centers" were five rented apartments, two in Washington and one each in Annapolis, Maryland; Landover, Maryland; and Alexandria, Virginia.

2. The government also contends Michael acted as a sort of "enforcer" and general factotum to Anderson.

3. Appellants Anderson, Nelson, Berdecia, Garces, Davis and Brathwaite were in the first group and were convicted in a trial conducted October 10, 1989 to December 8, 1989. Appellants Gregory Booze, Michael Booze and Thomas Booze were in the second group and were convicted in a trial conducted January 22, 1990 to March 2, 1990. Appellants Castillo, Dudley, Scott and Shand were in the third group and were convicted in a trial conducted September 12, 1990 to November 19, 1990.

U.S.C. § 924(c) and engaging in a continuing criminal enterprise (CCE) in violation of 21 U.S.C. § 848. The appellants were sentenced to prison terms ranging from 121 months (Gregory Booze) to 645 months (Anderson), and fines were imposed on appellants Anderson ($1,000,000), Berdecia ($25,000), Thomas Booze ($17,500) and Davis ($1,000,000).

The appellants have marshaled a host of challenges to both their convictions and their sentences. For the reasons set out below, we vacate Anderson's CCE and conspiracy convictions, remanding for entry of judgment on only one of those two counts, and his $1,000,000 fine, remanding for findings regarding his ability to pay it. We affirm all the other defendants' convictions but vacate their sentences and remand for findings regarding the quantity of drugs for which each appellant can be held accountable.[4]

## TABLE OF CONTENTS

I. PRETRIAL ISSUES
 A. The Wiretap Issue .............................................. 338
 B. The Criminal Justice Act ........................................ 342
 C. Peremptory Challenges .......................................... 343
 D. Brathwaite's Suppression Motion ................................. 345
II. TRIAL ISSUES
 A. Sufficiency of the Evidence ..................................... 347
 B. The Jencks Act ................................................. 348
 C. Adverse Spousal Testimonial Privilege ........................... 349
 D. Unanimity Instructions ......................................... 350
III. SENTENCING ISSUES
 A. Base Offense Level ............................................. 351
 B. Section 924(c)(1) .............................................. 353
 C. Cumulative Punishment ......................................... 357
 D. The $1 Million Fine ............................................ 357

## I. PRETRIAL ISSUES

### A. The Wiretap Issue

The drug conspiracy for which the appellants here were convicted was uncovered in large part through the use of wiretaps on various conventional and cellular phones. All the appellants seek reversal of their convictions on the grounds that the evidence derived from these wiretaps should have been suppressed because of alleged violations by the government of the wiretap statute.

■ The wiretap statute (Title III of the Omnibus Crime Control and Safe Streets Act of 1968) provides that:

> The Attorney General, Deputy Attorney General, Associate Attorney General, or any Assistant Attorney General, any acting Assistant Attorney General or any Deputy Assistant Attorney General in the Criminal Division *specially designated by the Attorney General,* may authorize an application

to a Federal judge ... for ... an order authorizing or approving the interception of wire or oral communications....

18 U.S.C. § 2516 (1988) (emphasis added). Once an authorized application for a wiretap has been granted, the statute requires that

> [e]very order and extension thereof shall contain a provision that the authorization to intercept ... shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter.... In the event the intercepted communication is in a code or foreign language, and an expert in that foreign language or code is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception.

18 U.S.C. § 2518(5) (1988). Finally, section 2518(10)(a) provides for the suppression of all evidence, either contained in, or derived

4. We have accorded all arguments full consideration but address in this opinion only those that warrant discussion.

from, a wiretap, if "the communication was unlawfully intercepted," or "the order of authorization or approval under which it was intercepted was insufficient on its face," or "the interception was not made in conformity with the order of authorization or approval." 18 U.S.C. § 2518(10)(a) (1988).[5]

On December 12, 1986, then-Attorney General Meese signed an order authorizing three Deputy Assistant Attorneys General (John C. Keeney, Stephen A. Saltzburg, and Mark M. Richard, referred to as DAAGs) to authorize applications for wiretaps. On August 12, 1988, Attorney General Meese resigned and Thornburgh took his place. Between September 20, 1988 and March 15, 1989, that is between one and seven months after Meese left office, nine wiretaps were issued pursuant to requests authorized by the three DAAGs. The authorization memoranda in question here were each addressed to Franklin Hess, Head of Enforcement, Criminal Division, and each purported to be from Edward Dennis, Acting Assistant Attorney General for the Criminal Division. The memoranda bore a line for Dennis' signature, over which a signature of one of the three DAAGs was found. On May 24, 1989, Attorney General Thornburgh redesignated these same DAAGs as authorized to approve wiretap applications.

Three violations of the wiretap statute are alleged to have occurred here. First, the appellants contend that the authorization memoranda prepared by the Justice Department were not in fact signed by their author. Second, the appellants contend that the authorizations designating certain officials to authorize wiretaps expired when they were not re-approved by the Attorney General who had replaced the designating Attorney

General. Third, the appellants argue that the minimization requirement of the wiretap statute was violated. We reject each of these challenges.

1.

■ The appellants first argue that the purposes of the wiretap statute—to assure that an accountable and identifiable person actually reviews wiretap requests, *see United States v. Giordano*, 416 U.S. 505, 515–16, 94 S.Ct. 1820, 1826–27, 40 L.Ed.2d 341 (1974) (statute requires "mature judgment of a particular, responsible Department of Justice official")—were thwarted because the person who signed the memoranda did not actually write them (*i.e.* the memos purported to be from Dennis but were signed by other people), and because there was no clear evidence as to who actually authorized the applications.[6] This argument is insubstantial. Assuming that the relevant DAAGs were properly authorized to approve applications, the fact that the memos they signed purported to be "from" Dennis is irrelevant to the purposes of the statute because those individuals who did sign the applications were identifiable. *See United States v. Chavez*, 416 U.S. 562, 575, 94 S.Ct. 1849, 1856, 40 L.Ed.2d 380 (1974) ("the misidentification of the officer authorizing the wiretap application did not affect the fulfillment of any of the reviewing or approval functions required by Congress"). We have refused to suppress evidence in similar circumstances. *United States v. James*, 494 F.2d 1007, 1017 (D.C.Cir.) (agreeing with the district court that it was "immaterial" that a memorandum was initialed by Assistant Attorney General Wilson when the decision was in fact made

---

**5.** In conjunction with the provisions of section 2518(5), this last requirement would apply the suppression remedy, where appropriate, to inadequately "minimized" interceptions.

**6.** The wiretap statute in effect at the time *Giordano* was decided provided that even assistant attorneys general could not authorize applications unless they had been specially designated to do so by the Attorney General and did not provide for authorizations by deputy assistants. Because the only persons permitted to authorize wiretap applications under the old act were political appointees requiring the confirmation of the Senate

it made sense for the Supreme Court, as well as for this court in *United States v. Robinson*, 698 F.2d 448, 452 (D.C.Cir.1983), to state that the purpose of the Wiretap Act was to limit authorizations to *politically accountable* officials. *See infra* Part I(A)(2). With the amendment of the statute to permit certain nonpolitically accountable deputy assistants in the criminal division to authorize applications, that purpose can no longer be ascribed to Congress. It would perhaps be more accurate, then, to attribute to Congress the purpose of limiting such authority to identifiable officials in positions of trust.

by Attorney General Mitchell), *cert. denied,* 419 U.S. 1020, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974). And the First Circuit approved of wiretaps under precisely the facts of this case. *United States v. Citro,* 938 F.2d 1431, 1435 (1st Cir.1991) (memo from Dennis signed for by Keeney), *cert. denied,* —— U.S. ——, 112 S.Ct. 902, 116 L.Ed.2d 804 (1992).

### 2.

■ The appellants next argue that the three DAAGs in question were not authorized to approve wiretap applications when those applications were made up to seven months after the designating Attorney General had left office. In other words, the appellants assert that the designations expired automatically upon a change of Attorneys General, or at least soon thereafter. This identical argument has been rejected by every circuit to have considered the issue, with the First, Second, Fourth, Sixth, Tenth and Eleventh Circuits holding that under principles of administrative continuity a designation of officials by one Attorney General continues in effect through a change in Attorneys General so long as the people designated continue to hold their offices. A typical case is *United States v. Kerr,* 711 F.2d 149 (10th Cir.1983). There, the Tenth Circuit upheld a wiretap where the application was authorized by an official almost two and one half years after the designating Attorney General had left office. The court reasoned:

> The wiretaps are obviously different in some respects from the other functions and the continuing activities of the Attorney General's staff through changes in administration. Nevertheless, in our opinion, when the authority to authorize applications for wiretaps has been validly delegated to a person in a particular position, as we are concerned with here, it continues so long as that person remains qualified. There was no limitation in the delegation of authority, and the statute contains no express limitations nor language from which one could be implied.

*Id.* at 150–51. To similar effect are *United States v. Lawson,* 780 F.2d 535, 539 (6th Cir.1985) (following *Kerr* ); *United States v. Terry,* 702 F.2d 299, 311 (2d Cir.) ("Adminis-

trative continuity requires that the designation by an outgoing Attorney General of Assistants to authorize electronic surveillance remain valid at least for a reasonable time after the Attorney General leaves office, even without an express redesignation by his successor."), *cert. denied,* 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983); *United States v. Messersmith,* 692 F.2d 1315, 1317 (11th Cir. 1982) (quoting *Wyder, infra* ); *United States v. Wyder,* 674 F.2d 224, 227 (4th Cir.) ("We can see no basis for holding that § 2516(1) represents a deviation from the usual rule that administrative orders ordinarily remain in effect beyond the tenure of the individual who issued them."), *cert. denied,* 457 U.S. 1125, 102 S.Ct. 2944, 73 L.Ed.2d 1340 (1982). The First Circuit has gone even further and held that an Attorney General's designation of an individual by job title is all that is required. Under that approach, a designation by one Attorney General of the "chief deputy assistant in the criminal division" would continue in force indefinitely through a change in both Attorneys General and deputy assistants, unless revoked. *See United States v. O'Malley,* 764 F.2d 38, 42 (1st Cir. 1985); *United States v. Bynum,* 763 F.2d 474, 475 (1st Cir.1985). Under either approach, the designations here suffice.

This issue, however, is somewhat complicated by our prior decision in *United States v. Robinson,* 698 F.2d 448, 452 (D.C.Cir. 1983). *Robinson* involved a challenge to the adequacy of authorization memoranda approved by an Assistant Attorney General who had been designated by a former Attorney General but not (until eight days after approval of the wiretap application) by the new Attorney General. In the course of concluding that "the authorization by Assistant Attorney General Litvack adequately satisfies the purposes of the statutory provision" because "Litvack had been specially designated by [the former Attorney General] within the literal meaning of Section 2516(1)," 698 F.2d at 452, we rejected the administrative continuity approach. Our reasoning in so doing, however, is no longer applicable. We stated:

> [A]rguments about the need for administrative continuity miss the mark in this case. The power to authorize electronic

surveillance applications is uniquely circumscribed by statute. Congress has identified a very limited category of officials who may legally wield this power. Section 2516's restrictions thereby ensure that decision-making is "centralize[d] in a publicly responsible official *subject to the political process.*" S.Rep. No. 1097, 90th Cong., 2d Sess. 97 (1968).

698 F.2d at 452 (emphasis added). In other words, our rejection of administrative continuity was premised on the notion that Congress intended only politically accountable officials (presidentially appointed and confirmed by the Senate) to authorize wiretap applications. On that premise, it was feasible to read the statute to require that upon a change in political administrations the newly appointed officials re-evaluate all outstanding designations to ensure full political accountability. That rationale was rejected by Congress, however, when it amended the statute to permit Deputy Assistant Attorneys General—nonpolitical appointees who are not "publicly responsible . . . to the political process"—to authorize wiretap applications. The administrative continuity approach followed by our sister circuits is surely now more appropriate. Nothing in the statute as amended suggests that, unlike other governmental authorizations, officials must be redesignated every time an Attorney General is replaced by a new official.

The appellants fix upon the following language in *Robinson:* "[S]ince the delay in revalidation was relatively brief and since the purposes of the statutory requirements were adequately served, we will not overturn the District Court's denial of appellant's motion to suppress." 698 F.2d at 452. Because the delay here—approximately seven months—

was considerably greater than the one month delay in *Robinson,* the appellants would have us conclude that the delay here was unreasonable and reverse. But, having concluded that "the purposes of the statutory requirements were adequately served," and that the designation fell within "the literal meaning of Section 2516(1)," our statements about the brevity of the delay in redesignating Litvack were only *dicta.* And, of course, our concern about delays in redesignation must be understood in light of the statute that we were interpreting at the time. Because our rejection of the administrative continuity approach was premised on Congress' then-expressed intention to limit designations to politically accountable persons, and because that rejection was the basis of our concern about the delay in redesignation, *Robinson's* statements about the length of any such delay—even if they had been the holding of the case—would not be binding on us after Congress' amendment of the statute.

■ We choose to join the majority of our sister circuits in holding that a designation continues in force through a change in attorneys general, so long as the designated Deputy Assistant remains in office. We leave for another day the question of whether the First Circuit's position, allowing designations by office rather than person, represents an acceptable application of the statutory command that Deputy Assistants be *"specially designated."* [7]

3.

■ The appellants next argue that the government violated another requirement of the statute by failing to reasonably "minimize" the number of intercepted calls that

---

7. It is worthwhile pointing out that even were we to conclude that the strictures of the wiretap statute were not fully complied with, suppression may not be the appropriate remedy. The Supreme Court has cautioned on a number of occasions that "suppression is required only for a 'failure to satisfy any of those statutory requirements that *directly* and *substantially* implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device.' " *United States v. Donovan,* 429 U.S. 413, 434–45, 97 S.Ct. 658, 671–77, 50 L.Ed.2d 652 (1977) (emphasis added) (quoting

*United States v. Giordano,* 416 U.S. 505, 527, 94 S.Ct. 1820, 1832, 40 L.Ed.2d 341 (1974)). In this case, it is difficult to fathom how the alleged defect to which defendants point seriously undermined the purposes of the Act where the officials authorizing the memoranda had at one time been designated by the Attorney General. Moreover, a decision not to suppress the evidence would not leave defendants without a remedy for an alleged violation, because the statute creates a private right of action for damages for individuals injured by an illegal wiretap. *See* 18 U.S.C. § 2520 (1988).

were not otherwise subject to interception. The appellants' argument below was apparently based on a statistical examination of certain logs which allegedly showed that only ten percent of the calls were "minimized" (*i.e.* were not monitored to the end of the conversation). The appellants never submitted, however, a formal "statistical analysis" which could have been entered into evidence. The government responds by pointing out that many of the conversations were too short in duration to minimize (*i.e.* to hang up in time) and that many others were in code or a foreign language (Spanish). The district court reviewed the evidence and concluded that it "amply" demonstrated the government's compliance, especially in these circumstances.

The Supreme Court has indicated that the minimization requirement is not an absolute prohibition on the interception of nonrelevant conversations, and has approved of government conduct where only 40% of the intercepted calls were conspiracy-related. *Scott v. United States,* 436 U.S. 128, 135, 140, 98 S.Ct. 1717, 1722, 1724, 56 L.Ed.2d 168 (1978). We have held that the standard is one of "reasonableness." *United States v. Wilson,* 835 F.2d 1440, 1445 (D.C.Cir.1987). Even if the minimization requirement was violated, moreover, we have indicated that "suppression" might not be an "appropriate remedy," *United States v. Scott,* 516 F.2d 751, 760 n. 19 (D.C.Cir.1975), *aff'd* by *Scott,* 436 U.S. at 140, 98 S.Ct. at 1724, and have suggested, although in *dicta,* that the only remedy might be the suppression of the nonrelevant calls, leaving the aggrieved individuals with a civil suit for damages under the statute. *See Scott,* 516 F.2d at 760 n. 19.

As the government emphasizes, the appellants make no effort to point to specific conversations that should not have been intercepted, or even to a pattern of such conversations. That only ten percent of calls were not monitored until the end proves nothing—even if true—because it may well have been that the remaining calls all related to the conspiracy or could not have reasonably been minimized. In light of the Supreme Court's decision in *Scott,* and without more concrete indications that the government failed to

meet its obligations to minimize intercepted communications, there was no error below.

Thus, the district court's refusal to suppress evidence derived from the wiretaps was proper, and we affirm its disposition of this issue.

### B. The Criminal Justice Act

Trial of the Group I defendants began on October 2, 1989, and ended on December 8. The Group II defendants were to go to trial on January 22, 1990. On January 3rd, counsel for one of the indigent defendants filed a voucher under the Criminal Justice Act, 18 U.S.C. § 3006(A), on behalf of all of the indigent defendants requesting transcripts of the earlier trial. Judge Johnson rejected this request as untimely. At a bench conference on January 23rd she explained that she had been out of town until Friday, January 12th, and had been unable to consider the request until Tuesday, January 16th, by which time it was too late to provide the requested transcripts.

On appeal two of the Group II defendants, Michael and Gregory Booze, argue that the district court's refusal to provide them with a transcript of the testimony from the trial of the Group I defendants denied them equal protection and due process of law, as well as their rights under the CJA, which provides:

Counsel for a person who is financially unable to obtain investigative, expert, or other services necessary to an adequate defense may request them in an ex parte application. Upon finding, after appropriate inquiry in an ex parte proceeding, that the services are necessary and that the person is financially unable to obtain them, the court ... shall authorize counsel to obtain the services.

18 U.S.C. § 3006A(e). Counsel maintained in district court that the transcripts, which fall into the category of "other services" that in some cases may be "necessary to an adequate defense," *United States v. Brown,* 443 F.2d 659, 660 (D.C.Cir.1970), should have been provided pursuant to the CJA because the government's FBI witness had testified differently at the first trial, and the defendants would be prejudiced without a transcript.

The government argues that the Booze brothers raise their equal protection and due process arguments for the first time on appeal. The record suggests otherwise, however. Although most of the argument in the district court regarding the requested transcripts revolved around the Jencks Act issue, counsel for one of the indigent defendants specifically argued on behalf of all of them that they were entitled to the transcripts under *Griffin v. Illinois.* In that case, the Supreme Court held that, where state law provides a right to appeal a criminal conviction, due process and equal protection require that an indigent defendant be furnished with a transcript if that is necessary in order to insure him "adequate and effective appellate review." 351 U.S. 12, 20, 76 S.Ct. 585, 591, 100 L.Ed. 891 (1956). *Griffin* is the first in a long line of Supreme Court cases defining the scope of indigents' rights to "the basic tools of an adequate defense or appeal, when those tools are available for a price to other prisoners." *Britt v. North Carolina,* 404 U.S. 226, 227, 92 S.Ct. 431, 433, 30 L.Ed.2d 400 (1971). Although it does not directly control in this situation, we think the appellants' reliance upon *Griffin* was enough to preserve their constitutional argument for appeal. We proceed, therefore, to the merits of the appellants' arguments, both statutory and constitutional.

As noted above, we have previously held that a defendant has both an equal protection and a statutory (CJA) right to a trial transcript where "such a transcript is 'necessary to an adequate defense.'" *Brown,* 443 F.2d at 660. Necessity is made out where "the defense attorney makes a timely request in circumstances in which a reasonable attorney would engage such services for a client having the independent financial means to pay for them." *United States v. Sims,* 617 F.2d 1371, 1375 (9th Cir.1980); *accord United States v. Durant,* 545 F.2d 823, 827 (2d Cir.1976); *Brinkley v. United States,* 498 F.2d 505, 509–10 (8th Cir.1974); *cf. United States v. Sheppard,* 559 F.Supp. 571, 573 (E.D.Va.1983) (quoting *Marzullo v. Maryland,* 561 F.2d 540, 543 (4th Cir.1977) (appropriate inquiry is whether, if defendant were not indigent, defense counsel would have to obtain transcript in order to "keep his representation within the 'range of competence demanded of attorneys in criminal cases' ")).

Here counsel stated at the appellants' trial that he believed that the FBI agent's testimony at the earlier trial was different from his testimony in the present case. The government argues that even if that be so, a transcript of the earlier testimony was not "necessary to an adequate defense": neither the government nor the non-indigent defendants had the transcript and, moreover, we are told, "most skillful cross-examiners would scorn the notion that they need transcripts in order to be effective."

As it turns out, however, we need not decide whether the transcripts were "necessary" in this case. The appellants do not dispute that in preparing their appeal they did have a copy of the transcript, yet they make no attempt to demonstrate that they were prejudiced at trial for want of the transcript, whether by virtue of any inconsistencies in the FBI agent's earlier testimony or otherwise. Therefore, if it was an error at all for the district court not to require the government to provide the transcripts upon request, the error was apparently harmless. *United States v. Bari,* 750 F.2d 1169, 1182 (2d Cir.1984).

### C. Peremptory Challenges

The Group III appellants seek reversal of their convictions on the ground that the district court's method of allocating peremptory challenges among the parties greatly disadvantaged the appellants and violated their rights under Federal Rule of Criminal Procedure 24 to a greater number of strikes than the government. Although we are troubled by the district court's actions, we conclude that reversal is not mandated in this case.

#### 1.

Federal Rule of Criminal Procedure 24(b) provides that in all felony cases not punishable by death the defendant shall be entitled to ten peremptory challenges and the government six. The district court in the trial of the Group III appellants employed a variant

of the "jury box" system of allocating peremptory challenges. Under that system

> twelve members of the array are selected by lot to enter the jury box; counsel for each side then exercise challenges for cause and their allotted number of peremptory challenges, in some prescribed pattern of alternation, against those seated in the jury box and against those drawn to replace any of the first twelve who have been challenged. When both sides have either used or waived their allotted challenges, the twelve members of the venire then in the jury box become the petit jury.

*United States v. Blouin,* 666 F.2d 796, 796 (2d Cir.1981). It is not uncommon under such a system after the first "round" of challenges to "permit[ ] subsequent challenges to be made only against those who have replaced jurors previously challenged." *Blouin,* 666 F.2d at 797 n. 1.

■■■ In this case the district court granted the appellants 12 peremptory challenges and the government seven.[8] If each side were to have exercised one challenge in each "round" (that is, prior to the seating of the next array of members), the defense would have been left with the last five challenges. Perhaps to avoid such a scenario, the district court permitted the government to elect not to exercise a strike in any particular round.[9] Neither side was permitted to strike a juror who had been seated in a prior round in which that party participated. Because the government could choose to wait a number of rounds before using its strikes, the system employed gave the government a certain informational advantage over the appellants. The government could "wait and see" whether to strike a particular juror until determining the characteristics of the juror

chosen to replace the member struck by the defense, while the defense had no such advantage.

### 2.

We have repeatedly recognized that a district court enjoys a great deal of discretion in the manner by which it impanels a jury. "It suffices that the method chosen allows the defendant to make his peremptory challenges without embarrassment and does not intimidate him from exercising them." *United States v. Broxton,* 926 F.2d 1180, 1182 (D.C.Cir.) (citing *Pointer v. United States,* 151 U.S. 396, 408, 14 S.Ct. 410, 414, 38 L.Ed. 208 (1894), and *United States v. Smith,* 891 F.2d 935, 938 (D.C.Cir.1989)), *cert. denied,* 499 U.S. 911, 111 S.Ct. 1118, 113 L.Ed.2d 226 (1991). Here, the appellants do not argue that the district court improperly prevented them from exercising their full array of challenges. Indeed, after conferring with his co-defendants, appellant Scott declined to exercise the defendants' final challenge. Instead, the appellants argue that the trial court improperly granted the government a tactical advantage: the right to "pass" in one round and yet strike in the next a juror who had been seated in that prior round. The appellants contend that the trial court thus discriminated against the defendants in an impermissible effort to equalize the two parties' strikes.

Although the trial court's empanelment procedure might ordinarily be objectionable, reversal is not called for in this case. To be sure, Rule 24 mandates that the defense enjoy a greater number of peremptory challenges than the government and in so doing purposefully envisions that the defense would have a greater impact on the jury through

---

**8.** Rule 24 states: "If there is more than one defendant, the court may allow the defendants additional peremptory challenges and permit them to be exercised separately or jointly." Fed. R.Crim.P. 24(b). A court apparently lacks authority to grant *the government* additional peremptory challenges in multi-defendant cases, and at least one court has held that a district court lacks authority to add to the government's six allotted peremptories unless defendants consent. *See United States v. Bruno,* 873 F.2d 555, 560–61 (2d Cir.), *cert. denied,* 493 U.S. 840, 110 S.Ct. 125, 107 L.Ed.2d 86 (1989). Defendants here do

not challenge the lower court's allocation to the government of seven peremptory challenges.

**9.** A more common method of avoiding that problem is to require the defense to exercise a greater number of peremptories per round than the government. Thus, where the defense has ten strikes and the government six, it is common to hold six rounds and allot the defendant two challenges in each of the first four rounds and one in each of the remaining two. *See Blouin,* 666 F.2d at 797 n. 1.

use of peremptory challenges than the government. And having allocated seven peremptories to the government and twelve to the defense, the trial court could easily have subjected both parties to the same rules without permitting the defendants to have the only peremptories in the final rounds by holding seven rounds of peremptory challenges and requiring the defense to exercise two challenges in each of the first five.

Nevertheless, the appellants do not assert that the jury that was actually empaneled was in any way biased. *Cf. United States v. Haldeman,* 559 F.2d 31, 80 n. 115 (D.C.Cir. 1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). Nor do the appellants point to any particular juror whom they would have wished to strike but could not in a situation where, had they been playing by the government's rules, a peremptory challenge would have been possible. As such, their allegations remain entirely theoretical. Finally, it is noteworthy that much, if not all, of the comparative advantage the lower court granted the government was offset, at least in part, because on one occasion the court did actually permit one of the appellants to strike a juror who had been seated in a prior round. We, therefore, conclude that the district court's jury selection method was not, in this case, reversible error.

### D. Brathwaite's Suppression Motion

Appellant Brathwaite argues that the district court erroneously decided not to suppress certain evidence recovered when Brathwaite was arrested because of an alleged violation of the "knock and announce" statute, 18 U.S.C. § 3109 (1988). We disagree.

#### 1.

The "knock and announce" statute provides that an officer "may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance...." 18 U.S.C. § 3109 (1988). The facts here are largely agreed upon. It is undisputed that on May 16, 1989, Agent Kerr, accompanied by a number of fellow agents, approached the door to Brathwaite's apartment, knocked and stated, "[O]pen the door. FBI." The district court credited the agent's testimony that he heard noises in the apartment (described at trial as "shuffling") both before and immediately after knocking. The agent also testified that he waited between 15–20 seconds, during which time he did not hear any noise from within, nor did Brathwaite make any apparent effort to open the door. Kerr then began hitting the door with a sledgehammer and within roughly a minute was inside. The FBI recovered a wallet containing credit and identification cards from inside a closet, and a scale and a bag with cocaine inside were recovered at the bottom of an air shaft four floors below Brathwaite's bathroom window. (Brathwaite claims, and we will assume, that those items would not have been visible to the agents from outside the apartment.)

#### 2.

The issue before us is fairly narrow, but significant. Both sides agree that the FBI agent knocked and announced his authority by stating "FBI." Both sides also agree that the agent did not state his *purpose* as section 3109 requires.[10] The government contends, and the lower court held, that the noises heard by the agent both before and immediately after knocking, combined with the failure to open the door, created "exigent circumstances" which excused the failure to announce a purpose because the agents could reasonably have feared that the occupant was destroying evidence.

---

**10.** On its face, section 3109 applies only to the execution of *search,* as opposed to arrest, warrants. Below, the government argued that the statute did not apply to arrests at all. On appeal it has apparently abandoned that argument. Although we have not squarely ruled on this question, other circuits have concluded that the section applies equally both to arrest and to search warrants, *see, e.g., United States v. De Parias,* 805 F.2d 1447, 1457 n. 3 (11th Cir.1986), *cert. denied,* 482 U.S. 916, 107 S.Ct. 3189, 96 L.Ed.2d 678 (1987); *United States v. Little,* 753 F.2d 1420, 1435 (9th Cir.1984); *United States v. Nolan,* 718 F.2d 589, 591 (3d Cir.1983); *cf. Sabbath v. United States,* 391 U.S. 585, 587, 88 S.Ct. 1755, 1756, 20 L.Ed.2d 828 (1968) (section 3109 applies to entries to effect a warrantless arrest), and we will assume as much for purposes of this opinion.

Appellant Brathwaite emphasizes that the agents waited between 15–20 seconds, by Kerr's estimate, before beginning to break down the door, during which time the agents could easily have announced their purpose without in any way aggravating the dangers to themselves or to the evidence. Although the district court concluded (in an aspect of its opinion from which Brathwaite does not appeal) that the warrantless search conducted by the officers once *inside* the apartment was consensual, the legality of the search itself is insufficient, as a matter of law, to overcome an illegal entry under section 3109. *See United States v. Sheard,* 473 F.2d 139, 142 (D.C.Cir.1972), *cert. denied,* 412 U.S. 943, 93 S.Ct. 2784, 37 L.Ed.2d 404 (1973).[11] If the officers' entry into the apartment violated that statute, then the products of the subsequent search would have to be suppressed, regardless of the reasonableness of the search. We examine, then, the permissibility of the agents' actions in entering the apartment.

The governing case in our circuit is *United States v. James,* 764 F.2d 885 (D.C.Cir.1985). There we stated:

In the ordinary case an officer is required to state both his authority and his purpose. In this case, however, the police, after knocking and announcing their authority repeatedly, but without eliciting a response, heard someone running down the back stairs. A reasonable interpretation of such sounds is that the inhabitants are well aware of the purpose of the police visit and are moving to destroy evidence. This is especially true where, as here, the police knew they had reliable information that cocaine was being sold at that location. Faced with the probable imminent destruction of evidence, the police acted properly by entering the premises at once. To require the police in these circumstances to announce that they are there to execute a search warrant would be to require a futile

act. Compliance with section 3109 is unnecessary in such circumstances.

*Id.* at 888 (citations omitted). The holding in *James,* then, was based on two related strands of analysis. The probable imminent destruction of evidence gave rise to exigent circumstances sufficient to excuse full compliance with section 3109's requirements; and the sounds from inside the apartment, suggesting that evidence was being destroyed, made the need to announce the reasons for the police presence futile. In *James* the officers knocked repeatedly before eventually breaking in, a fact that suggests that the officers could well have announced their purpose while so doing. Nevertheless, we concluded that the facts gave rise to a sufficient danger that evidence would be destroyed such that noncompliance with the "purpose" requirement would be excused.

The facts in this case, which are virtually identical to those in *James* except for the fact that the officers here heard "shuffling" rather than evidence of flight, make it indistinguishable from *James* in all respects but one: the officers in James were present to execute a search warrant, whereas the officers in the case before us were seeking to effect an arrest. But that seems to us to be a distinction without a difference. To be sure, the prospect of destroyed evidence might have been thought to be a greater threat when police officers have come to search for evidence than when officers seek to arrest an individual. The former stands as a greater *immediate* impediment to the accomplishment of the officers' mission. The Supreme Court, however, has recently clarified that under the Fourth Amendment, exigent circumstances sufficient to excuse the warrantless entry into a house for purposes of effecting an arrest include the imminent destruction of evidence. *See Minnesota v. Olson,* 495 U.S. 91, 100, 110 S.Ct. 1684, 1689, 109 L.Ed.2d 85 (1990) (concluding that the Minnesota Supreme Court had applied the "proper legal standard" when it observed

---

**11.** As we stated:

[A]ssuming a valid consensual entry, the issues of § 3109 compliance, probable cause to arrest, and plain view search are easily dispatched; once inside appellant's apartment the police conduct was manifestly proper. If,

however, there was neither consent to entry nor § 3109 compliance, the latter two issues become irrelevant and the conviction must be overturned.

473 F.2d at 142.

that "a warrantless intrusion [to make an arrest] may be justified by ... imminent destruction of evidence"). In this respect the Supreme Court's Fourth Amendment cases do not distinguish between arrests and searches: fear of the immediate destruction of evidence excuses the absence of a warrant to do either. Neither do our own. We have at least twice in recent years recognized that a reasonable fear that evidence would imminently be destroyed created those exigent circumstances that would excuse the failure to obtain a warrant prior to entering a home to effect an arrest. *See United States v. Dawkins,* 17 F.3d 399, 405 (D.C.Cir.1994); *United States v. Socey,* 846 F.2d 1439, 1444–45 (D.C.Cir.), *cert. denied,* 488 U.S. 858, 109 S.Ct. 152, 102 L.Ed.2d 123 (1988).

■■■■■ If the imminent destruction of evidence is sufficient to excuse noncompliance with a constitutional mandate such as the Fourth Amendment, we do not see why a different, more stringent, standard should apply to the confessed noncompliance with section 3109's statutory dictates. At least one circuit has held that the imminent destruction of evidence provides sufficient exigency to excuse noncompliance with section 3109, even where the officers in question were there to arrest rather than search. *See United States v. Wysong,* 528 F.2d 345 (9th Cir.1976). This is all the more true where, as here, such noncompliance was only partial. As we have held, the degree of exigency necessary to excuse a partial violation of the knock and announce statute is considerably less than that required to excuse a total disregard of that statute, much less the absence of a warrant altogether:

> The exigency required to justify a warrantless search differs from that required to excuse noncompliance with section 3109's announcement provision. That degree of exigency is, in turn, greater than that needed to excuse noncompliance with only the refusal portion of section 3109.

*United States v. Bonner,* 874 F.2d 822, 826 (D.C.Cir.1989). This is especially true where the admitted failure—the lack of any announcement regarding the agents' *purpose*—did not materially affect any of appellant's interests. As we reasoned in *James,* where the defendant is heard hiding or destroying evidence, or fleeing, to require the police to announce their purpose in seeking entry would indeed be to require a futile and pointless act. *See James,* 764 F.2d at 888. It is of no avail, then, for appellant to argue in these circumstances that the police had sufficient time during the approximately 15 seconds that they awaited a response to announce their purpose. The district court found that the police heard noises consistent with the destruction of evidence emanating from within the apartment, and that the persons inside made no effort to respond to the officers' knock. Those findings are not clearly erroneous. In these circumstances, it would, therefore, have been presumably futile for the police to announce their purpose. Accordingly, the district court's judgment, denying Brathwaite's motion to suppress, must be affirmed.

## II. TRIAL ISSUES

### A. Sufficiency of the Evidence

■■■■ The appellants next challenge the sufficiency of the evidence on various grounds but we find it necessary to address only the argument that the trial evidence varied materially from the indictment's allegations. Specifically, the appellants argue that the trial evidence at most established multiple conspiracies rather than the single conspiracy charged in the indictment. Because none of the appellants raised the variance argument below, we review only for plain error, *see Jackson v. United States,* 359 F.2d 260 (D.C.Cir.), *cert. denied,* 385 U.S. 877, 87 S.Ct. 157, 17 L.Ed.2d 104 (1966), and finding none decline to reverse the convictions on this ground.

■■■■ Initially, we find it likely that the government's proof in fact varied from the indictment's conspiracy count, manifesting, as the appellants assert, multiple conspiracies rather than a single overarching one. *See United States v. Townsend,* 924 F.2d 1385, 1395–1402 (7th Cir.1991) (finding three separate conspiracies between three different

suppliers and a common purchaser).[12] Such variance, however, is not by itself a sufficient ground for reversing the appellants' convictions. To secure reversal, each appellant must establish not only the fact of variance but also that the variance caused him substantial prejudice. *United States v. Tarantino*, 846 F.2d 1384, 1391 (D.C.Cir.) (citing *United States v. Caporale*, 806 F.2d 1487, 1499–1500 (11th Cir.1986)), *cert. denied*, 488 U.S. 840, 109 S.Ct. 108, 102 L.Ed.2d 83 (1987), *cert. denied*, 488 U.S. 867, 109 S.Ct. 174, 102 L.Ed.2d 143 (1988). When variance is asserted in the number of conspiracies, the most commonly claimed prejudice, and one claimed here, is that the multiplicity of defendants and conspiracies created a substantial likelihood that the jury transferred evidence from one conspiracy to a defendant in another. We do not believe the appellants were so prejudiced.

We first note that the trial court severed the defendants into three small groups which it tried separately, thereby minimizing the likelihood of "spillover." *See United States v. Alessi*, 638 F.2d 466, 475 (2d Cir.1980) ("While a prejudicial variance may become more likely as the number of improperly joined defendants increases, *compare Berger v. United States*, [295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)] (4 defendants), *with Kotteakos v. United States*, [328 U.S. 750, 766, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946)] (32 defendants), ... the number of persons tried together here (10 defendants) was sufficiently small to enable the jury to give individual consideration to each."). Further, the evidence against the appellants consisted primarily of discrete telephone conversations to which the individual appellants were parties and which the jurors could readily "compartmentalize." *See United States v. Toliver*, 541 F.2d 958, 963 (2d Cir. 1976) (finding no prejudice from variance where "the evidence uniquely lent itself to such a compartmentalized consideration"); *United States v. Townsend*, 924 F.2d at 1411 ("danger of 'spillover prejudice'" is "minimal

... when the government presents tape recordings of each and every defendant discussing the distribution of illegal drugs" and "the jury had no need to look beyond each defendant's own words in order to convict"). Finally, the appellants cannot claim prejudice from the admission of co-conspirators' statements since in each case the bulk of the incriminating evidence consisted of statements by the individual appellant himself or by someone with whom he in fact conspired (most notably Anderson). *Cf. id.* at 1411 (no prejudice when court admitted statements made by one with whom defendant "clearly conspired" or even by non-co-conspirators where, as here, "there was little need, if any, for the jurors to look to the words of others when each defendant supplied enough to ensure his own undoing") (citation omitted). In sum, we find no substantial likelihood that the appellants' convictions resulted from any spillover effect and accordingly find no prejudice warranting their reversal.[13]

## B. The Jencks Act

■ After the government finished direct examination of its first witness—the FBI agent who was the lead investigator in this matter—the Group II defendants requested all Jencks Act material from the government, including the transcripts of the FBI agent's testimony in the trial of the Group I defendants. The prosecution gave the defendants a copy of all of the transcripts in its possession. In response to the defendant's objection that these did not include a transcript of the agent's direct testimony in the earlier trial, the district court held that the Jencks Act, 18 U.S.C. § 3500, does not require the government to produce a trial transcript it does not have. Whether a trial transcript is Jencks Act material is a question of law, which we review *de novo*.

The Jencks Act requires the United States to produce "statement[s] of ... witness[es] in possession of the United States which relate[ ] to the subject matter as to which the

---

**12.** *See also infra* Part III(A) (vacating sentences and directing district judge to make individual determinations regarding each defendant's conspiratorial participation of the sort the *Townsend* court made in its multiple conspiracy analysis).

**13.** The appellants also claim prejudice in the length of the sentences they received, a matter properly addressed under the sentencing guidelines. *See infra* Part III(A).

witness has testified." 18 U.S.C. § 3500(b). The statute is "designed to further the fair and just administration of criminal justice, a goal of which the judiciary is the special guardian." *Campbell v. United States,* 365 U.S. 85, 92, 81 S.Ct. 421, 425, 5 L.Ed.2d 428 (1961). To this end, the Act " 'reaffirms' " the Supreme Court's holding in *Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), "that the defendant on trial in a federal criminal prosecution is entitled, for impeachment purposes, to relevant and competent statements of a government witness in possession of the government touching the events or activities as to which the witness has testified at trial." *Id.* The Act defines a "statement" (at § 3500(e)) to include:

> (1) a written statement made by said witness and signed or otherwise adopted or approved by him;
>
> (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or
>
> (3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

▪ The appellants argue that "prior trial testimony of a government witness meets the requirements for a 'statement' which must be disclosed to the defense." The government counters that a trial transcript is not within the coverage of the Jencks Act at all, and some courts have so held. Those courts proceed from the premise that the purpose of the Act is to "protect government files against unwarranted intrusions prompted by the excessively expansive reading by some lower federal courts of the United States Supreme Court's decision in *Jencks v. United States,*" and thus to "protect government witnesses from threats, bribery, and perjury." *United States v. Isgro,* 974 F.2d 1091, 1095 (9th Cir.1992). Because trial transcripts are matters of public record, they have reasoned, the limitations of the Jencks Act cannot be used to shield them, and thus the Congress must not have intended to cover them in the first place. *Id.; accord Unit-*

*ed States v. Harris,* 542 F.2d 1283, 1293 (7th Cir.1976); *United States v. Munroe,* 421 F.2d 644, 645 (5th Cir.1970). We need not decide in this case, however, whether trial transcripts fall within the scope of the Jencks Act, because the trial testimony at issue in this case clearly was not in the possession of the government.

▪ The government cannot "possess" a statement as defined in the Jencks Act apart from the writing or recording in which it is memorialized. Further, to be producible under the Jencks Act, a "statement" (i.e. the transcript or recording thereof) must be "in the possession of the United States." 18 U.S.C. § 3500(b). If the government has not requested and received a transcript from a court reporter, then obviously the transcript or statement is not "in the possession of the United States." *See United States v. Moeckly,* 769 F.2d 453, 464 (8th Cir.1985); *United States v. Cagnina,* 697 F.2d 915, 922 (11th Cir.1983); *United States v. Hutcher,* 622 F.2d 1083, 1088 (2d Cir.1980); *United States v. Baker,* 358 F.2d 18, 20 (7th Cir.1966) ("The government has no obligation to transcribe stenographic notes of testimony in a criminal trial just in case some of the witnesses might be later called upon to testify in a related trial"); *see also United States v. Clark,* 928 F.2d 733, 738 (6th Cir.1991) (untranscribed testimony at detention hearing not "in possession" of government); *United States v. Trevino,* 556 F.2d 1265, 1271 (5th Cir.1977) (presentence report under control of probation officer is not "in possession of the United States" for purposes of the Act). As the Second Circuit has stated, "clearly the government cannot be required to produce that which it does not control and never possessed or inspected." *United States v. Canniff,* 521 F.2d 565, 573 (2d Cir. 1975); *cf. United States v. Merlino,* 595 F.2d 1016, 1019 (5th Cir.1979) ("the government can't refuse" to provide a transcript of relevant grand jury testimony "merely because the [witness'] statement is in shorthand and has not been transposed [sic] in a manner to be read by others").

*C. Adverse Spousal Testimonial Privilege*

Before testifying for the government at trial, Wilhelmina Perry Garces claimed that

she was married to defendant Norberto Garces and that she wished to invoke the adverse spousal privilege not to testify against her husband. Judge Johnson appointed counsel for Ms. Garces and held a hearing on the applicability of the privilege. The district court determined that the Garces' marriage was not intact, that "the purpose of protecting vital marriages from the harmful impact of compelled testimony would not be served in this case," and therefore that Ms. Garces would have to testify.

Norberto Garces argues that the district court erred in failing to apply the standard set forth in D.C.Code § 14–306(a), which, Garces claims, gives his spouse an unqualified privilege not to testify against her husband. The government responds that the district court properly consulted the federal common law as directed by Federal Rule of Evidence 501, rather than the D.C.Code, and correctly determined that the Garces' marriage was not intact before denying the privilege.

We need not determine whether the district court erred in this instance, however, because under both the federal and D.C. law the spousal privilege is that of the witness-spouse alone, not that of the nontestifying spouse. *See Trammel v. United States,* 445 U.S. 40, 53, 100 S.Ct. 906, 913, 63 L.Ed.2d 186 (1980); *Bowler v. United States,* 480 A.2d 678, 685 (D.C.App.1984). Thus, Garces is without standing to contest the district court's decision to compel Wilhelmina Perry Garces to testify. *See United States v. Lofton,* 957 F.2d 476, 477 n. 1 (7th Cir.1992); *Grand Jury Subpoena of Ford v. United States,* 756 F.2d 249, 255 (2d Cir.1985).

### D. Unanimity Instructions

Next appellant Anderson and appellants Gregory Booze and Thomas Booze challenge the judge's failure to instruct the jurors that they were required to make unanimous findings regarding certain elements of the offenses, respectively, of engaging in a continuing criminal enterprise and of conspiracy. Because none of the three appellants objected to the challenged omissions below, we again review only for plain error, *United States v. Sayan,* 968 F.2d 55, 59 (D.C.Cir.1992), and again we find none.

First, appellant Anderson objects to the judge's failure to instruct the jurors that, in order to convict him of managing a continuing criminal enterprise in violation of 21 U.S.C. § 848, they were required to agree unanimously on the particular predicate acts committed and the identities of the five individuals managed. We disagree. In *United States v. Harris,* 959 F.2d 246 (D.C.Cir.), *cert. denied,* —— U.S. ——, ——, 113 S.Ct. 362, 364, 121 L.Ed.2d 275, 277 (1992), we rejected the appellant's Sixth Amendment and due process challenges to the lack of a CCE unanimity instruction, holding, as six other circuits already had,[14] that a jury is not required to unanimously agree on the identities of the individuals managed. We found no Sixth Amendment problem because "the statute makes relevant only the number, but not the identities, of the defendant's co-conspirators," *id.* at 255, and therefore the "jury was unanimous in deciding that the government here proved what it had to prove—that Palmer had acted in concert with 'five or more persons,'" *id.* at 256 (citing *Schad v. Arizona,* 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991) (majority and plurality opinions)). We further concluded that "the Due Process Clause permits different people to serve as 'alternative means' of satisfying the CCE five-person requirement" because to do so did not violate "any historical or contemporary notions of fundamental fairness" and because it is "beyond dispute that acting in concert with one group of five persons is the moral and practical equivalent of acting in concert with another group of five." *Id.* at 256–57. We see no reason to treat a finding of predicate acts differently. That

---

**14.** *See United States v. Markowski,* 772 F.2d 358, 364 (7th Cir.1985), *cert. denied,* 475 U.S. 1018, 106 S.Ct. 1202, 89 L.Ed.2d 316 (1986); *United States v. Moorman,* 944 F.2d 801 (11th Cir.1991) (per curiam), *cert. denied,* —— U.S. ——, 112 S.Ct. 1766, 118 L.Ed.2d 427 (1992); *United States v. English,* 925 F.2d 154, 159 (6th Cir.), *cert. denied,* 501 U.S. 1211, 111 S.Ct. 2812, 115 L.Ed.2d 984 (1991); *United States v. Linn,* 889 F.2d 1369, 1374 (5th Cir.1989), *cert. denied,* 498 U.S. 809, 111 S.Ct. 43, 112 L.Ed.2d 19 (1990); *United States v. Jackson,* 879 F.2d 85, 88 (3d Cir.1989); *United States v. Tarvers,* 833 F.2d 1068, 1074 (1st Cir.1987).

one juror may find one group of predicate offenses, while another may find a different, if overlapping, group seems of little moment. As *Harris* teaches, unanimity is required in the finding that each essential element of the CCE offense is satisfied, not in the subsidiary findings regarding the particulars of each element. Accordingly, we find no merit in appellant Anderson's unanimity charge challenge.

■■■■■ For similar reasons we reject the argument advanced by Gregory Booze and Thomas Booze that the trial judge erred in failing to instruct the jurors they were required to unanimously identify the precise object of the conspiracy of which the two appellants were convicted. These appellants contend that the omission of a unanimity charge permitted the jurors to convict them of conspiracy without reaching agreement on whether they conspired to distribute cocaine or to possess with intent to distribute cocaine, particularly in light of the judge's initial reference, in setting out the elements of conspiracy, to the two alternative objectives in the "disjunctive." *See* Trial II Tr. (2/27/90) at 29–37. As we observed in *Harris,* however, "the law of CCE tracks the law of conspiracy, which generally has not required jurors to identify the defendant's co-conspirators." 959 F.2d at 256. We see no reason to set a more exacting standard for identifying the conspiratorial objective, particularly where, as here, the alternative objectives (distributing cocaine and possessing cocaine with intent to distribute) are so similar. It is enough that jurors unanimously find that a defendant entered into an unlawful conspiracy, thereby satisfying the statutory elements of conspiracy; they need not also agree on the precise object of that conspiracy. As the Second Circuit has observed: "The essence of the crime of conspiracy is an agreement to put into effect an illegal project. Even if the agreement contemplates more than one nefarious end, there is still but a single agreement." *United States v. Murray,* 618 F.2d 892, 898–99 (2d Cir.1980) (finding no unanimity problem

when appellants were convicted on charge of importing and distributing both cocaine and marijuana).

## III. SENTENCING ISSUES

### A. Base Offense Level

■■■ Next, we address the appellants' arguments that their sentences were impermissibly enhanced based on drugs unrelated to their participation in the conspiracy.[15] Under the sentencing guidelines, a defendant's base offense level is determined by his "relevant conduct." When a defendant is sentenced on a drug trafficking offense, the base offense level is determined by the amount of drugs involved in the "relevant conduct"— the greater the quantity, the higher the base level. *See* U.S.S.G. pt. D of Ch. 2. In sentencing the appellants, the district court held each accountable for the full amount of drugs involved in Anderson's entire conspiracy, 28.9 kilograms. For the reasons set out below, we conclude that all of the appellants' sentences, except for Anderson's, must be vacated and remanded to the district court for particularized factual findings regarding the amount of cocaine attributable to each appellant's participation in the Anderson organization.

The guidelines define "relevant conduct" generally to include "all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense, or that otherwise were in furtherance of that offense." U.S.S.G. § 1B1.3(a)(1). The Application Notes in effect at the time of sentencing explained the subsection's application to conspiracies as follows:

> In the case of criminal activity undertaken in concert with others, whether or not charged as a conspiracy, the conduct for which the defendant "would be otherwise accountable" also includes conduct of oth-

---

**15.** Some of the appellants challenged their sentences on sufficiency of the evidence grounds, but, as we observed *supra* note 13, this issue is properly resolved under the sentencing guidelines.

ers in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant. Because a count may be broadly worded and include the conduct of many participants over a substantial period of time, the scope of the jointly undertaken criminal activity, and hence relevant conduct, is not necessarily the same for every participant. Where it is established that the conduct was neither within the scope of the defendant's agreement, nor was reasonably foreseeable in connection with the criminal activity the defendant agreed to jointly undertake, such conduct is not included in establishing the defendant's offense level under this guideline.

U.S.S.G. § 1B1.3 n. 1 (1990); *see also id.* § 2D1.4 n. 1 ("If the defendant is convicted of conspiracy, *see* Application Note 1 to § 1B1.3 (Relevant Conduct).").

▆ This court recently applied these provisions to the sentencing of defendants convicted, like the appellants here, of participating in "a large but loose-knit" drug distribution conspiracy and laid down the basic principles a sentencing judge must follow in determining the amount of drugs attributable to a particular defendant. In *United States v. Saro,* 24 F.3d 283 (D.C.Cir.1994), the court stated:

The extent of a defendant's vicarious liability under conspiracy law is always determined by the scope of his agreement with his co-conspirators. Mere foreseeability is not enough: someone who belongs to a drug conspiracy may well be able to foresee that his co-venturers, in addition to acting in furtherance of his agreement with them, will be conducting drug transactions of their own on the side, but he is not automatically accountable for all of those side deals. *See, e.g., United States v. Jenkins,* 4 F.3d 1338, 1346–47 (6th Cir. 1993); *United States v. Evbuomwan,* 992 F.2d 70, 73–74 (5th Cir.1993).... "[A] general verdict does not establish with whom a defendant conspired or the quantity of drugs encompassed by the conspiracy." *United States v. Edwards,* 945 F.2d

1387, 1391 (7th Cir.1991). To calculate the amount of drugs attributable to defendants under the third category of "relevant conduct",[16] the sentencing court must "determine the scope of the conspiratorial agreement each joined". *United States v. Thompson,* 944 F.2d 1331, 1344 (7th Cir. 1991); *accord United States v. Goines,* 988 F.2d 750, 775 (7th Cir.1993).

*Id.* at 288. Applying these principles, the court remanded for redetermination of one appellant's base offense level because the judge had simply adopted, without analysis, the presentence report's apparent conclusion that the defendant "was *automatically* responsible for the '[s]pecific drug sales and drug related activity conducted by members of the conspiracy', ... at least if he knew about and could foresee that activity." *Id.* at 288–89 (record citations omitted; emphasis in original). Such automatic, unexplained attribution was, the court found, plain error requiring resentencing because the legal standard applied "seems to conflict with the well-established principles of conspiracy law" and because it was "reasonably likely ... that a factfinder applying the proper legal standard" would not have charged the defendant with the entire amount. *Id.* at 290. We reach a similar conclusion here.

▆ It appears from the sentencing transcripts that the district court here, as in *Saro,* simply adopted the presentence reports' apparent conclusions that each defendant should automatically be accountable for the amount of cocaine involved in all the charged transactions, which the reports found to be 28.9 kilograms. Based on this quantity the judge assigned each conspirator a base offense level of 34 for trafficking in 15–50 kilograms of cocaine. *See* U.S.S.G. § 2D1.1(c) (Drug Quantity Table). A fair view of the evidence, however, shows it is at least "reasonably likely" that a factfinder applying the legal standard set out in *Saro* would hold the appellants other than Anderson accountable for less than the entire quantity and, more significantly, for less than the threshold 15 kilogram amount. The five suppliers, for example, *appear* to have been operating in isolation and to have "agreed"

---

**16.** By "third category" the quoted language means "acts and omissions ... for which the defendant would be otherwise accountable." U.S.S.G. § 1B1.3(a)(1).

only to participate in the distribution of the small amounts they supplied.[17] Similarly, some of Anderson's purchasers seem to have had but limited "agreements" to purchase discrete drug quantities at specific times. Finally, it is possible that some or all of the distribution center workers were responsible for distributing fewer than 15 kilograms. In the absence of individualized, factual findings regarding reasonable foreseeability as it relates to each appellant's conspiratorial participation, we are unable to resolve these matters or uphold the appellants' sentences. Accordingly, we conclude that all of the appellants' sentences except Anderson's must be vacated and remanded for resentencing based on specific, individualized findings regarding the quantity of drugs each appellant might have reasonably foreseen his or her agreed-upon participation would involve. *See Saro, supra* (remanding for further findings to support attribution of certain quantities of drugs to appellant); *United States v. Perkins,* 963 F.2d 1523, 1528 (D.C.Cir.1992) (remanding to sentencing court to "decide whether a preponderance of the evidence supports the inference that [drugs found in co-conspirator's house] were reasonably foreseeable to [defendant]" where "district court did not at any point make a specific finding about foreseeability"); *United States v. Lam Kwong–Wah,* 924 F.2d 298, 307 (D.C.Cir. 1991) (remanding to sentencing judge "for resentencing and for clarification of the factual findings concerning what [the defendant] knew or reasonably could have foreseen concerning the quantity of drugs involved in the transaction" and observing that "[t]he judge, who heard all of the evidence and may perhaps draw inferences that we would have difficulty discerning from the paper record, should be given the opportunity to make new findings as appropriate"), *cert. denied,* —— U.S. ——, 113 S.Ct. 287, 121 L.Ed.2d 213 (1992).

### B. Section 924(c)(1)

In the indictment Anderson was charged with, among other offenses, four counts of using and carrying a firearm in relation to a drug trafficking conspiracy, in violation of 18 U.S.C. § 924(c)(1). Count 83 of the indictment charges that Anderson used a .9mm pistol that FBI agents seized when they arrested two juveniles in Dallas, Texas in February 1989; at Anderson's direction, the juveniles were taking the gun to Los Angeles, where Anderson planned to rob a drug source. Count 93 charges that Anderson used one of two pistols that were seized in L.A. from defendant Emmanuel Harris in March 1989; Anderson had sent Harris with the guns and ammunition after his first robbery plan was foiled. Count 117 charges that Anderson used a Browning .380 semi-automatic pistol that was seized, along with crack cocaine, cocaine, drug paraphernalia, and $1,000 in $1 bills, in the Park Towers distribution center when Anderson was arrested there in May 1989. Finally, Count 118 charges that Anderson used a .9mm semi-automatic pistol that was seized, along with ammunition, drug paraphernalia, and documents linking Anderson to the location, from the Woodner distribution center on the day that Anderson was arrested at the Park Towers.

The jury convicted Anderson on each of the four counts, and the district court sentenced him to five years for each offense, the sentences to run consecutively. On appeal, Anderson does not dispute that he "used" each of the guns, nor could he succeed under our recent decision in *United States v. Bailey,* 36 F.3d 106 (D.C.Cir.1994) (*in banc*). Rather, he argues that he cannot be convicted and sentenced, consistent with the Double Jeopardy clause of the Constitution, for multiple violations of section 924(c)(1) that are all linked to the same conspiracy charge.

The government argues that Anderson waived this argument because he failed to object before trial that the indictment was multiplicitous. "An indictment is

---

17. As the *Saro* court observed, however, even competing suppliers may be charged with drug quantities supplied by each other if "their relation with the network might have been such as to make them responsible for its entire distribution activity." 24 F.3d at 289 (citing *Edwards,* 945 F.2d at 1393, and *Blumenthal v. United States,* 332 U.S. 539, 559, 68 S.Ct. 248, 257, 92 L.Ed. 154 (1947)).

multiplicious, and thereby defective, if a single offense is alleged in a number of counts, unfairly increasing a defendant's exposure to criminal sanctions." *United States v. Harris,* 959 F.2d 246, 250 (D.C.Cir.1992). In this circuit, as in many others, objections to multiplicity in an indictment that are not raised before trial are indeed waived, pursuant to Federal Rule of Criminal Procedure 12(b)(2) and (f), absent a showing of good cause. *Id.* (collecting cases from five circuits); *see also United States v. Wilson,* 983 F.2d 221, 225 (11th Cir.1993); *United States v. Marroquin,* 885 F.2d 1240, 1245 (5th Cir.1989); *Mitchell v. United States,* 434 F.2d 230, 231 (9th Cir.1970).

Anderson's objection·here is not to multiplicity in the indictment, however. Rather, he contends that his sentence on multiplicitous counts is illegal. As Professor Wright explains, the "principal danger in multiplicity is that a defendant will be given multiple sentences for the same offense." 1 Charles A. Wright, Federal Practice & Procedure § 145, at 525–26 (2d ed. 1982). Such an error may be corrected at any time pursuant to Federal Rule of Criminal Procedure 35. As one court explained,

> Rule 12 applies only to objections with regard to error in the indictment itself; the effect of Rule 12 is that dismissal of a multiplicious indictment is not required; however, if sentences are imposed on each count of a multiplicious indictment the defendant is not forced to serve the erroneous sentence because of any waiver.

*United States v. Rosenbarger,* 536 F.2d 715, 721–22 (6th Cir.1976); *accord* Wright, *supra,* § 193, at 702 n. 31, § 145, at 525–26 & n. 14 and 1994 Supp. § 145 n. 14 (collecting cases). *See also United States v. Reed,* 639 F.2d 896, 904 n. 6 (2d Cir.1981) ("The principal danger in multiplicity—that the defendant will be given multiple sentences for the same offense—can be remedied at any time").

Anderson also failed to object in the district court to the entry of multiple convictions and sentences under section 924(c)(1). Therefore, our review is for plain error only.

*United States v. Brown,* 16 F.3d 423, 427 (D.C.Cir.1994).

Section 924(c)(1) provides:

> Whoever, during and in relation to any crime of violence or drug trafficking crime ... for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years.... In the case of his second or subsequent conviction under this subsection, such person shall be sentenced to imprisonment for twenty years....

Quoting *United States v. Privette,* 947 F.2d 1259, ·1262–63 (5th Cir.1991), Anderson argues that in order to "avoid violating double jeopardy principles ... 'each firearms offense must be sufficiently linked to a separate drug trafficking offense to prevent two convictions under Sec. 924(c) on the same drug offense.'" Notwithstanding the reference to "double jeopardy principles," this argument is essentially a matter of statutory construction. As the Supreme Court explained in *Missouri v. Hunter,* 459 U.S. 359, 366, 103 S.Ct. 673, 678, 74 L.Ed.2d 535 (1983), "[w]ith respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended."

We begin, therefore, with the text of the statute, which is quite clear: it proscribes the use or carrying of *a* firearm during and in relation to a drug trafficking offense. Anderson used a firearm in relation to a drug trafficking offense on at least four separate occasions, to further four distinct purposes. No amount of sophisticated analysis can avoid the conclusion that he thereby violated section 924(c)(1) four times, and therefore can be convicted and sentenced four times.

Bear in mind that section 924(c)(1) is not a sentence enhancement provision; rather, it is a compound offense of which the predicate offense is one element.[18]

---

18. Although our dissenting colleague, Judge Silberman, acknowledges that a violation of section

924(c) is a separate crime, he interprets the statute as though it were an enhancement provi-

*See United States v. Laing,* 889 F.2d 281, 288 (D.C.Cir.1989). A violation of · section 924(c)(1) is a crime separate from the predicate drug trafficking offense or crime of violence. *Simpson v. United States,* 435 U.S. 6, 10, 98 S.Ct. 909, 911, 55 L.Ed.2d 70 (1978). Indeed, the defendant need not .be convicted of, .or even charged with, a drug trafficking offense for the section 924(c)(1) conviction to be upheld as long as the government proves all of the elements of that offense beyond a reasonable doubt. *See United States v. Laing,* 889 F.2d 281, 289 (D.C.Cir.1989) (upholding § 924(c)(1) conviction although defendant acquitted on predicate offense); *accord United States v. Hill,* 971 F.2d 1461, 1463–64 (10th Cir.1992) (en banc); *United States v. Ospina,* 18 F.3d 1332, 1336 (6th Cir.1994) (defendant pled guilty to § 924(c)(1) violation only, and not to predicate drug trafficking offense); *accord Myers v. United States,* 993 F.2d 171, 172 (8th Cir.1993); *United States v. Hunter,* 887 F.2d 1001, 1003 (9th Cir.1989); *United States v. Munoz–Fabela,* 896 F.2d 908, 910–11 (5th Cir.1990) (defendant pled guilty to § 924(c)(1) violation predicated on drug trafficking offense that was charged in separate indictment and then dropped in exchange for guilty plea to misprision of felony); *United States v. Wilson,* 884 F.2d 174, 176–77 (5th Cir.1989) (one-count indictment charged only violation of § 924(c)(1)). If a defendant can be convicted for one violation of section 924(c)(1) without being convicted of a predicate crime, then we see no reason why he cannot be convicted of four violations of .section 924(c)(1) without being convicted of four, or any other number, of predicate offenses, so long as each section 924(c)(1) violation has the requisite relationship to such an offense.

The purpose of section 924(c)(1), to "combat ... the use of dangerous weapons—most particularly firearms—to commit federal felonies," *Simpson v. United States,* 435 U.S. 6, 10, 98 S.Ct. 909, 911, 55 L.Ed.2d 70 (1978), requires this straightforward reading. Simply put, the statute was intended to deal with the danger posed by guns, and that danger is posed anew each time a gun is used. If a drug trafficking conspirator could be convicted for only one section 924(c)(1) violation, however, there would be no marginal penalty for, and hence no deterrence of, any gun use after the first one. Making subsequent gun uses "free," as it were, would be an incentive, not a deterrent, to multiple uses. There is no reason to believe that the Congress intended so perverse a result.

■ Some other circuits have nonetheless held that no more than one section 924(c)(1) conviction may be linked to a single drug trafficking offense, even .if the defendant used different guns on separate occasions during the course of a drug trafficking conspiracy. *See United States v. Hamilton,* 953 F.2d 1344, 1346 (11th Cir.1992); *United States v. Smith,* 924 F.2d 889, 894 (9th Cir. 1991); *United States v. Henry,* 878 F.2d 937, 943 (6th Cir.1989). In their analysis, the unit of prosecution is the drug trafficking crime (here conspiracy) rather than the use of a gun in relation to the drug trafficking crime. *See, e.g., United States v. Lindsay,* 985 F.2d 666, 673 (2d Cir.1993) ("The statute ... emphasizes the relationship between the firearms and the underlying drug-trafficking crime, rather. than the individual firearms themselves, thus providing some indication that Congress did not intend a separate violation for each firearm"). Predicate offense(s) may be an appropriate unit of account where the prosecution seeks convictions on two or more section 924(c)(1) counts for the use of a single gun on a single occasion by linking the section 924(c)(1) charges to nominally separate. offenses that are not in fact separable for double jeopardy purposes, *see, e.g., United States v. Chalan,* 812 F.2d 1302, 1317 (10th Cir.1987) (multiple §. 924(c)(1) convictions and sentences for

---

sion: it "asks a binary question—whether [the defendant] has or has not used a gun during and in relation to the crime. The answer to that question is either "yes" or "no," but it cannot be "yes, yes, yes, and yes." (Dissent, *post,* at 359–60). Under that interpretation each use of a gun after the first is a freebie, as long as it is committed in connection with the same predicate offense. Judge Silberman offers no support for

this peculiar interpretation of a criminal statute—other than his opinion that under the more natural interpretation the penalty is too steep. That, however, is a matter for the Congress to determine. *See also Deal v. United States,* —— U.S. ——, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993) (approving a 105–year sentence for six violations of § 924(c)).

murder of storekeeper during robbery cannot be predicated upon offenses of felony murder and robbery, which are not themselves distinct offenses for double jeopardy purposes); or, although we express no opinion on the matter, where more than one gun is used to protect a stash of drugs in a single location. *See United States v. Alvarado,* 882 F.2d 645, 654 (2d Cir.1989); *but see United States v. Freisinger,* 937 F.2d 383, 388–90 (8th Cir.1991). We think it is untenable, however, in a case such as this, where the defendant used a gun on four separate and distinct occasions, for four separate and distinct purposes over the course of a long-lived drug trafficking conspiracy.[19]

We are also aware that some courts have invoked the rule of lenity (as would our dissenting colleague) to determine that section 924(c)(1) "is ambiguous as to the appropriate unit of prosecution." *United States v. Lindsay,* 985 F.2d 666, 675 (2d Cir.1993). As the Second Circuit explains it:

> When viewed as a whole, this firearms statute . . . is ambiguous as to the appro-

priate unit of prosecution. Section 924(c)(1) concerns the relationship between firearms and violent crimes or drug-trafficking offenses. It is not clear that Congress sought to punish a defendant separately for every firearm used during a single drug-trafficking offense, rather than punish the defendant for the general act of using firearms in relation to the underlying drug offense.

*Id.; see also, e.g., Chalan,* 812 F.2d at 1317.

 We think they misapply the rule of lenity. That the Congress did not expressly address a particular issue does not necessarily mean that the appropriate interpretation of the statute is unclear. *See Albernaz v. United States,* 450 U.S. 333, 341–42, 101 S.Ct. 1137, 1144, 67 L.Ed.2d 275 (1981) ("Lenity . . . serves only as an aid for resolving an ambiguity; it is not to be used to beget one"). It is only if, "after 'seizing every thing from which aid can be derived' the Court is 'left with an ambiguous stat-

---

**19.** Our dissenting colleague is concerned that if "each 'use' of a gun during and in relation to a drug crime is a separate violation of § 924(c)," then "when the crime is an ongoing one like possession with intent to distribute, or an ongoing conspiracy, the same gun might be thought to be used hundreds of times. . . ." (Dissent, post at 3). While stated hyperbolically, his underlying point is unremarkable. If a drug offender is shown to have used his gun on two or ten or indeed hundreds of occasions, then he has violated the statute that many times.

Where the use of a gun in relation to a drug trafficking crime is itself of a continuing nature, of course, only a single § 924(c) charge is warranted. As the Supreme Court explained in *United States v. Midstate Co.,* 306 U.S. 161, 166, 59 S.Ct. 412, 414, 83 L.Ed. 563 (1939):

> A continuing offense is a continuous, unlawful act or series of acts set on foot by a single impulse and operated by an unintermittent force, however long a time it may occupy.

In some section 924(c) cases the use of a gun may be a continuing offense—as where the defendant once puts it in a chest or drawer or closet and leaves it there to protect a drug stash; there is a single impulse with respect to the gun, namely to protect the drugs, and thus a single section 924(c) violation. There are separate § 924(c) violations, separately indictable, however, where "successive impulses are separately given. . . . The test is whether the individual acts are prohibited, or the course of action which they constitute." *Blockburger v. United States,* 284 U.S. 299, 302, 52 S.Ct. 180, 181, 76 L.Ed. 306 (1932). In *Blockburger* the Court held that separate drug sales on successive days constituted two violations of the Harrison Narcotic Act,

26 U.S.C. § 696, because "the first transaction, resulting in a sale, had come to an end. The next sale was not the result of the original impulse, but of a fresh one—that is to say, of a new bargain." *Id.* at 303, 52 S.Ct. at 181. The Court pointed out that the "Narcotic Act does not create the offense of engaging in the business of selling the forbidden drugs, but penalizes any sale made in the absence of either of the qualifying requirements set forth." *Id.* at 302, 52 S.Ct. at 181. Similarly, section 924(c) creates an offense not of "engaging in the use of weapons" but of using a weapon in relation to a drug trafficking crime. Each use that is prompted by a separate impulse is therefore a separate violation.

We agree with the Eighth Circuit that "each separate use of a firearm . . . is punishable under section 924(c) regardless of whether other section 924(c) charges are related to the same predicate offense." *United States v. Lucas,* 932 F.2d 1210, 1223 (8th Cir.1991). In *Lucas* the court approved two § 924(c) convictions and sentences for the defendant's use of guns for two different purposes: the pistol was used in the defendant's home to protect drug money and cocaine held for personal use, while the machine gun was used to protect a crack lab and the large inventory of drugs kept there. Similarly, in this case, each of the four section 924(c) counts involves a use of a gun for a distinct purpose: two were used to protect separate stashes, and two were sent to Los Angeles with different couriers on different occasions for the purpose of robbing a drug source. Separate impulses drove each use; no two were implicated in a single continuing section 924(c) offense.

ute,' " that the rule of lenity dictates that the matter be resolved in favor of the accused. *Smith v. United States,* ⸺ U.S. ⸺, ⸺, 113 S.Ct. 2050, 2059, 124 L.Ed.2d 138 (1993) (quoting *United States v. Bass,* 404 U.S. 336, 347, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971) (quoting *United States v. Fisher,* 6 U.S. (2 Cranch) 358, 386, 2 L.Ed. 304 (1805))). We find no such ambiguity in section 924(c)(1). Indeed, Anderson has pointed to nothing in the statute (or its legislative history) that raises any doubt about its meaning.

With this understanding of section 924(c)(1) in mind, we can readily· dispatch Anderson's double jeopardy argument. Because the statute clearly makes a separate offense out of each use of a gun in relation to a drug trafficking offense, the double jeopardy prohibition is no bar to consecutive sentences for multiple violations of that provision. The district court committed no error in this regard.

### C. Cumulative Punishment

Anderson was convicted of participating in a narcotics conspiracy, 21 U.S.C. § 846, and of engaging in a continuing criminal enterprise (CCE), 21 U.S.C. § 848, for which he was given concurrent sentences of 405 months (33 years, nine months) on each count. Anderson argues that because conspiracy is an element of the CCE offense, the double jeopardy clause of the Constitution bars his being convicted and sentenced on both counts.

■ The double jeopardy clause prohibits punishing a defendant for a section 846 conspiracy and a CCE involving the same conduct. *Jeffers v. United States,* 432 U.S. 137, 155, 97 S.Ct. 2207, 2218, 53 L.Ed.2d 168 (1977). Because punishment for both offenses would be cumulative, judgment may be entered for only one of them; even concurrent sentences, that is, can not be squared with the intent of the Congress not to inflict cumulative punishments. *Ball v. United States,* 470 U.S. 856, 864, 105 S.Ct. 1668, 1673, 84 L.Ed.2d 740 (1985) ("The second conviction, whose concomitant sentence is served concurrently, does not evaporate simply because of the concurrence of the sentence"). Therefore, one of Anderson's convictions must be vacated. *See United States*

*v. Cloutier,* 966 F.2d 24, 30 (1st Cir.1992); *United States v. Bafia,* 949 F.2d 1465, 1474 (7th Cir.1991); *United States v. Duke,* 940 F.2d 1113, 1120 (8th Cir.1991); *United States v. Chambers,* 944 F.2d 1253, 1268–69 (6th Cir.1991); *United States v. Nixon,* 918 F.2d 895, 908 (11th Cir.1990); *United States v. Stallings,* 810 F.2d 973, 975–76 (10th Cir. 1987).

The government makes no objection to Anderson's request to have his conviction and sentence for conspiracy vacated, although the resulting sentence will be shorter than if the CCE conviction were vacated. The district court imposed sentence at the offense level applicable to conspiracy, 34, adjusted upward to 38 for Anderson's leadership role in the offense. The base offense level for the CCE is 36. *See* U.S.S.G. § 2D1.5 (October 15, 1988). Therefore, in this case the conspiracy conviction, although the "lesser" of the two offenses, actually carries a higher adjusted base offense level than does the CCE conviction.

At oral argument the government suggested that the adjusted base offense level for the other crimes of which Anderson was convicted—possession with intent to distribute and distribution—would mirror that of the conspiracy offense, 38. Presumably, then, sentence could be imposed at the adjusted offense level for one of those offenses rather than at the base level for the CCE. That is a matter for the district court to determine, however. Therefore, we remand Anderson's case to the district court with directions to vacate his conviction and sentence for conspiracy, and to recalculate the appropriate sentence under the remaining counts.

### D. The $1 Million Fine

■ The district court fined Anderson $1,000,000. Anderson argues that the court's determination that the fine was appropriate is contrary to the evidence and in contravention of § 5E1.2(d)(2) of the Sentencing Guidelines, which requires that the district court relate any fine to the defendant's ability to pay. As Anderson concedes, the Sentencing Guidelines do not require, and we have specifically declined to require, that the trial judge make findings of fact regarding a defendant's ability to pay the fine imposed.

"So long as the sentencing judge in fact considers ability to pay, he is in compliance with the guideline's mandates." *United States v. Mastropierro,* 931 F.2d 905, 906 (D.C.Cir.1991). We "review the finding of ability necessarily implied by such consideration" looking only for clear error. *Id.* at 906–07.

The government argues that the district court "in fact consider[ed Anderson's] ability to pay," that the fine imposed was well within the statutory and guideline ranges, and therefore that we must affirm it. Here is what the district court had to say about Anderson's ability to pay:

> Now, the probation department has recommended that I not impose a fine in this case because they seem to believe that Mr. Anderson doesn't have any money. I'm not certain of that. I know that there are going to be a lot of asset forfeitures of property here in the United States, but Panama may be opening up, and I don't know whether Mr. Anderson has a lot of money in Panama or not. I have reason to believe that money was coming from Panama for some purpose after his arrest. So I don't know whether he has any money in Panama or not. If he does have money in Panama, I am going to fine him one million dollars on counts 1 and 2.

Counsel for Anderson then objected that Anderson "doesn't have a million dollars," to which the district court replied, "He may not."

While it is clear that the district judge did consider Anderson's ability to pay a $1,000,000 fine, her implicit determination that he had the ability to pay it is at war with her explicit acknowledgment that he may not, and is therefore clearly erroneous. We recognize, of course, that a fine is meant to be punitive; that it causes hardship does not mean that it is erroneously imposed, *Mastropierro,* 931 F.2d at 907, but quite the opposite. Nothing in the present record, however, even remotely suggests that Anderson could ever pay a $1,000,000 fine.

Anderson's presentence report indicates that at sentencing he had a net worth of $96,000 (most of it the equity in his home) and that the government had instituted civil forfeiture proceedings against his property.

Anderson was sentenced to 645 months (53 years, nine months) in prison; once he is released from prison he will not only be rather old to work off so large a fine; he will also be subject to deportation, and presumably will be deported, because he is an illegal alien. Thus, all the evidence suggests that Anderson will not be able to "obtain employment and pay the fines over time." *Mastropierro,* 931 F.2d at 907.

The government argues that the district court's cognizance of the significant wealth Anderson enjoyed as a drug dealer—his extravagant spending habits, his ownership of a home and several apartments and of expensive cars and jewelry—supports the court's conclusion that the amount of the fine was appropriate "to reflect the seriousness of the offense (including the gain to the defendant), to promote respect for the law, to provide just punishment and to afford adequate deterrence." Perhaps so, but the government's rationale does not override the district court's duty under the Guidelines to consider the defendant's ability to pay.

Unable to point to any evidence suggesting that Anderson in fact has assets in Panama, the government argues that it is Anderson's burden to prove that he has no such assets and thus cannot pay the fine. Nothing in the Guidelines, the case law, or indeed common sense, supports that position. The government cites two cases. In one of them the court held that where the government alleges that a defendant owns a specific asset that could be used or liquidated to pay a fine, the defendant seeking to avoid the fine must prove that the asset is not his or that it would not cover the fine assessed. *United States v. Preston,* 910 F.2d 81, 89–90 (3d Cir.1990). In the other case the court found that the defendant had actively hindered the government's efforts to determine his ability to pay by "refus[ing] to provide any information regarding his financial status." Moreover, $80,000 had been withdrawn from the defendant's bank account shortly before his arrest. *United States v. Rafferty,* 911 F.2d 227, 232 (9th Cir.1990).

While it makes good sense to burden a defendant who has apparently concealed assets, here the government has made no such showing; nor has the government offered anything to substantiate its suspicion that

Anderson has assets in Panama. In such a case the burden does not shift to Anderson to prove that he does not have assets in Panama. Upon remand, therefore, the district court should also reconsider the fine to be imposed upon Anderson in light of the record evidence regarding his ability to pay.

\* \* \*

For the preceding reasons, we affirm all of the appellants' convictions except Anderson's conspiracy and CCE convictions which we vacate and remand with direction to reinstate only one of them. We further remand Anderson's $1,000,000 fine for reconsideration of his ability to pay it and remand all of the other appellants' prison sentences for reconsideration of the scope of each individual's participation in the Anderson drug distribution network.

So ordered.

SILBERMAN, Circuit Judge, dissenting in part:

Appellant Anderson raises one further argument—a pure question of statutory interpretation—with which I agree. He contends that his multiple convictions under four separate counts of violations of section 924(c)(1) are based on a misreading of the statute. Since the government asserts that he committed only one drug trafficking crime—a section 846 conspiracy—he cannot be guilty of more than one violation of section 924(c)(1) in connection with that conspiracy. As does the majority opinion, I include the precise language of section 924(c)(1).

> Whoever, during and in relation to any crime of violence or drug trafficking crime ... for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years.... In the case of his second or subsequent conviction under this subsection, such person shall be sentenced to imprisonment for twenty years....

It seems that there are three possible meanings that can be derived from this language. The first, argued by appellant, is that the unit of prosecution is the drug trafficking crime, i.e., it does not matter how many times a single gun is "used" during the commission of a drug trafficking crime nor how many guns are used during that period; the statute contemplates only one section 924(c)(1) conviction for each event or series of events that constitutes one crime. (That, of course, does not mean that the defendant must be charged with the underlying drug crime; only that the elements of that crime, as a predicate to the section 924(c)(1) violation, must be proven beyond a reasonable doubt. *See United States v. Laing*, 889 F.2d 281, 288 (D.C.Cir.1989), *cert. denied*, 494 U.S. 1069, 110 S.Ct. 1790, 108 L.Ed.2d 792 (1990)). In other words, once the jury determines that a defendant has committed the underlying crime, it asks a binary question—whether he has or has not used a gun during and in relation to the crime. The answer to that question is either "yes" or "no," but it cannot be "yes, yes, yes, and yes." All six circuits that have encountered this issue, with the single exception (prior to this case) of the Eighth Circuit, have read section 924(c)(1) in this manner. *See United States v. Lindsay*, 985 F.2d 666, 674–76 (2d Cir.1993), *cert. denied*, ——— U.S. ———, 114 S.Ct. 103, 126 L.Ed.2d 70 (1993); *United States v. Sims*, 975 F.2d 1225, 1233 (6th Cir.1992), *cert. denied*, ——— U.S. ———, 113 S.Ct. 1315, 122 L.Ed.2d 702 (1993); *United States v. Moore*, 958 F.2d 310, 312–14 (10th Cir.1992); *United States v. Hamilton*, 953 F.2d 1344, 1345–46 (11th Cir.), *cert. denied*, ——— U.S. ———, 113 S.Ct. 240, 121 L.Ed.2d 174 (1992); *United States v. Privette*, 947 F.2d 1259, 1262–63 (5th Cir.1991), *cert. denied*, ——— U.S. ———, 112 S.Ct. 1279, 117 L.Ed.2d 505 (1992); *United States v. Fontanilla*, 849 F.2d 1257, 1258–59 (9th Cir.1988).

The second reading of the statute was developed by the Eighth Circuit. It puts the emphasis not on each separate "use," but on separate "guns." That is to say, whenever the defendant uses more than one gun during the commission of a drug crime he violates section 924(c)(1) as many times as he uses an additional gun. *United States v. Freisinger*, 937 F.2d 383 (8th Cir.1991). The Eighth Circuit arrived at this interpretation because the statute refers to "a" gun; therefore, according to that court, the language unambiguously contemplates that each separate gun used during and in relation to the drug crime

gives rise to a new violation of section 924(c)(1). I find the Eighth Circuit's exegesis quite unpersuasive; it does not seem to me to have semantic plausibility.

Not surprisingly, the Eighth Circuit, once adopting the "each gun is a separate violation" reading, flinched from the sentencing implications of its decision, and instead determined that "because [the defendant] was carrying more than one firearm during a single drug trafficking offense, the convictions after the first one are not 'second or subsequent' convictions within the meaning of the statute." *Freisinger,* 937 F.2d at 391. Accordingly, the court concluded "that the sentence imposed on multiple section 924(c)(1) convictions based on a single underlying offense cannot exceed five years." 937 F.2d at 392. Ironically, then, the only court to interpret section 924(c)(1) as permitting multiple *convictions* for the use of separate guns during a single crime did not apply that holding to require, as the statute does, multiple *punishments* for those uses. If that holding were actually applied in this case it would leave Anderson convicted of four section 924(c)(1) violations but would require his sentence to be reduced from 20 to five years.

The Eighth Circuit expanded somewhat on *Freisinger* in *United States v. Edwards,* 994 F.2d 417 (8th Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 701, 126 L.Ed.2d 667 (1994). There it held that where "two firearm counts were based upon two separate seizures of weapons" the evidence suggested "the use of different weapons at different times [which] ... constitutes two separate 924(c) offenses for which consecutive sentences may be imposed." 994 F.2d at 424. *See also United States v. Mabry,* 3 F.3d 244 (8th Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 1403, 128 L.Ed.2d 75 (1994) (same); *United States v. Lucas,* 932 F.2d 1210 (8th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 399, 116 L.Ed.2d 348 (1991) (same). Under the Eighth Circuit's current view, then, a defendant who uses multiple firearms during one underlying crime can be convicted separately for each use, unless the firearms were all used at the same time (which apparently would include continuing uses during an extended conspiracy), in which case only one five-year sentence may be entered; whereas,

if the uses occurred separately 20–year consecutive sentences may be imposed for each subsequent offense after the first.

The third reading, which the majority pioneers (although it does not disavow the Eighth Circuit's "separate gun" analysis), is that each separate deployment of a gun during and in relation to a drug crime is a new violation of section 924(c)(1). That interpretation is linguistically plausible, but I do not believe it is what Congress intended. One can easily conceive of a defendant holding, brandishing, or referring to a gun a number of times in the course of committing a drug trafficking offense such as a sale. As I understand the majority, each time he would be indulging a separate "impulse" and then committing a separate section 924(c)(1) violation. Maj.Op. at 356 n. 19. And when the offense, as in this case, is a conspiracy lasting over months, the same gun might be so employed scores or even hundreds of times. Presumably, under the majority's reasoning, if a defendant were charged with possession of drugs with intent to distribute and kept a gun in a chest, each time he indulged the impulse to fondle the gun so as to embolden his criminal determination, *see United States v. Bailey,* 36 F.3d 106, 114, 116 (citations omitted) (D.C.Cir. Oct. 4, 1994) (*en banc*), he would have committed a fresh section 924(c)(1) violation.

Although section 924(c)(1) is not just a sentencing enhancement provision—it is, as the majority emphasizes, a separate crime—nevertheless, the first section 924(c)(1) violation calls for five years imprisonment, and the second and all others for an additional 20 years each. If each separate "use" of a gun, so defined, during a commission of a drug crime was a separate violation it would not be unusual for the government to obtain, as a practical matter, a life sentence whenever a gun accompanies a drug crime. Indeed, in this case, had Anderson been sentenced after the Supreme Court decided *Deal v. United States,* — U.S. ——, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993) (affirming 105–year sentence for six convictions under section 924(c)(1)), he would have received not just 20 years because of the four separate section 924(c)(1) convictions, but 65 years. I think if Congress had intended such a severe sentence to be imposed on a defendant who

displays a gun more than once in relation to the same drug trafficking conviction, it would have said so more directly.

The majority contends that the dominant reading of section 924(c)(1) provides insufficient deterrence of multiple "uses" of a gun in relation to a single crime. But the majority's reasoning suggests that Congress actually contemplated that a defendant, having brandished a gun once in connection with a drug trafficking crime—let's suppose at 9:00 p.m. when, as a seller, he was introduced to a prospective drug purchaser—conceivably would be deterred from brandishing a gun the second time at 9:30 p.m. when the sale was consummated. I think that is a rather farfetched supposition of congressional purpose. Congress *was* concerned about heightened disincentives. After all, the second and succeeding convictions for section 924(c)(1) violations carry a 20–year sentence. But, if Congress had contemplated the majority's exquisite concept of disincentives to deter a criminal's repeated brandishing of a gun while committing a drug trafficking offense, surely Congress would have been a good deal more precise as to its definition of "use." [1]

I believe the more plausible and logical interpretation of section 924(c)(1) to be the one six circuits have endorsed. And, in any event, given the ambiguity of the statutory language, the rule of lenity dictates that we accept appellants' argument. *Lindsay, supra,* 985 F.2d at 676 (citation omitted); *United States v. Chalan,* 812 F.2d 1302, 1317 (10th Cir.1987) (citations omitted).

I respectfully dissent.

Before: EDWARDS, Chief Judge; WALD, SILBERMAN, BUCKLEY, WILLIAMS, GINSBURG, SENTELLE, HENDERSON, RANDOLPH, ROGERS and TATEL, Circuit Judges.

### ORDER

No. 90–3041

Feb. 9, 1995

Appellant's Suggestion For Rehearing *In Banc* and the response thereto have been circulated to the full court. The taking of a vote was requested. Thereafter, a majority of the judges of the court in regular active service voted in favor of the suggestion. Upon consideration of the foregoing, it is

**ORDERED,** by the Court *in banc,* that the suggestion is granted and this case will be reheard by the court sitting *in banc.*

It is **FURTHER ORDERED,** by the court *in banc,* that the judgment of the court filed herein on October 18, 1994, is hereby vacated.

A future order will govern further proceedings.

1. In that connection, it is ironic that for purposes of *this* case the majority, *see* Maj.Op. at 356 n. 19, seems to embrace a definition of "use"—at least with respect to the *additional* alleged section 924(c)(1) violations—which is close, if not identical, to the definition for which we dissen- ters argued in *United States v. Bailey,* 36 F.3d 106, 111, 113 (D.C.Cir.1994) (*en banc.*)—an active employment, or "impulse" to use a gun, rather than a passive possession. The result of the majority's position here is that defendants get the worst of both analytical worlds.