UNITED STATES of America, Appellee

v.

Perry A. GRAHAM, Appellant.

UNITED STATES of America, Appellee

v.

Terrence A. TERRELL, Appellant.

UNITED STATES of America, Appellee

v.

Roger V. SMITH, Appellant.

Nos. 93–3217, 93–3218 and 94–3001.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 7, 1995.

Decided May 21, 1996.

Robert E. Sanders, Washington, DC, appointed by the court, argued the cause and filed the briefs for appellant Terrence A. Terrell.

Mary E. Davis, Washington, DC, appointed by the court, argued the cause and filed the briefs for appellant Roger V. Smith.

Pleasant S. Brodnax, III, Alexandria, VA, appointed by the court, was on the briefs for appellant Perry A. Graham.

E. Vaughn Dunnigan, Assistant United States Attorney, argued the cause for appellee with whom Eric H. Holder, Jr., United States Attorney, John R. Fisher, Roy W. McLeese, III, Lynn C. Leibovitz, Elizabeth H. Danello, and Geoffrey Bestor, Assistant United States Attorneys, were on the brief. Elizabeth Trosman, Assistant United States Attorney, Washington, DC, entered an appearance.

Before: RANDOLPH, ROGERS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

Perry A. Graham, Terrence A. Terrell, and Roger V. Smith appeal their convictions of conspiring together and with others to distribute 50 grams or more of crack cocaine and of several individual counts of distributing crack cocaine. They also appeal their life sentences. Although we affirm their convictions, we vacate their sentences and remand for the district court to resolve their factual challenges to the presentence report as required by Federal Rule of Criminal Procedure 32(c)(1) and to make individualized findings as to whether the amount of crack cocaine attributed to each appellant was within the scope of the conspiratorial agreement entered into by that appellant and reasonably foreseeable by him. We also direct the district court to determine whether Terrell's claimed vulnerability to prison abuse warrants a downward departure and whether record evidence exists to support the upward enhancement of his sentence for his alleged managerial role.

## I.

The three appellants in this case were charged with conspiring together and with others from July 1990 to January 1992 to distribute and possess with intent to distribute 50 grams or more of cocaine base (crack) in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(iii) and 21 U.S.C. § 846. Appellants were also charged with eleven individual counts of distribution on specific dates between July 1990 and January 1992 in violation of 21 U.S.C. § 841(a)(1). Other members of the alleged conspiracy were indicted separately; some, not now before us, were charged as "drug kingpins"; others pleaded guilty before trial.

Viewed in the light most favorable to the Government, see United States v. Tarantino, 846 F.2d 1384, 1391 (D.C.Cir.), cert. denied, 488 U.S. 840, 109 S.Ct. 108, 102 L.Ed.2d 83, and 488 U.S. 867, 109 S.Ct. 174, 102 L.Ed.2d 143 (1988), the evidence at trial established that the three appellants were part of the "Newton Street Crew," a cocaine trafficking organization involving more than twenty people which operated on Newton Street between 14th Street and 16th Street from June 1987 until police shut it down through mass arrests on July 29, 1992. The Newton Street Crew consisted of three different "cliques" or groups of people selling drugs together at three Newton Street locations. Mark Hoyle and John McCullough, the heads of the Newton Street Crew, distributed crack through "lieutenants" in the three cliques, who in turn distributed the drugs to "runners." Runners sold the crack to other runners or directly to customers.

Appellants were members of the same clique. They operated at the center of Newton Street between 14th Street and 15th Street. Appellants Graham and Smith were lieutenants. After receiving drugs from Hoyle, they distributed them to runners, but sometimes sold the drugs directly themselves. Operating just below Graham and Smith, Terrell functioned somewhere between lieutenant and runner: he received drugs from Graham and Frank Lynch, another Crew lieutenant not before us, selling the drugs directly to customers or through runners.

After the jury convicted appellants of all counts, the district court sentenced them to life imprisonment on the conspiracy count and one to ten years on each of the remaining counts, all sentences to run concurrently. Appellants now challenge their convictions and sentences.

## II.

We begin with appellants' challenges to their convictions.

### SINGLE V. MULTIPLE CONSPIRACY

■ Appellants first argue that the record contains insufficient evidence to convict them of the conspiracy charged in the indictment. They argue that instead of proving a single overarching conspiracy in which all three appellants were working together and with others towards a common goal, the Government's evidence establishes only multiple conspiracies—separate, unrelated, or at most casually related, transactions. According to appellants, the evidence establishes no interdependence or mutual benefit between the "cliques" selling drugs on Newton Street, or between appellants' clique and Hoyle. Appellants second and related claim is that the evidence of multiple conspiracies presented at trial materially varied from that charged in the indictment, depriving them of a fair trial. Variance is grounds for reversal only if appellants can show that the variance is material and that it substantially prejudiced them, such as by causing the jury to "transfer evidence from one conspiracy to a defendant involved in another." *Tarantino*, 846 F.2d at 1391 (citation omitted).

■ Our role in reviewing these claims is limited. "[V]iewing the evidence in the light most favorable to the prosecution," we ask whether "*any* rational trier of fact could have found the essential elements of [conspiracy] beyond a reasonable doubt." *United States v. Washington*, 12 F.3d 1128, 1135–36 (D.C.Cir.) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560 (1979)) (internal quotation marks omitted), *cert. denied,* —— U.S. ——, 115 S.Ct. 98, 130 L.Ed.2d 47 (1994). The essential element of conspiracy is an agreement with at least one other person to violate the law. *See United States v. Lam Kwong-Wah*, 924 F.2d 298, 303 (D.C.Cir.1991). In determining whether a single conspiracy existed, as opposed to separate unrelated activities or multiple conspiracies, we look for several factors, including whether participants shared a common goal ("such as the possession and distribution of narcotics for profit"); interdependence between the alleged participants in the conspiracy; and, though less significant, overlap among alleged participants. *Tarantino*, 846 F.2d at 1393.

Applying these standards, we review the record to determine whether the Government presented sufficient evidence to permit the jury to find that a drug-selling conspiracy controlled by Mark Hoyle and joined by appellants operated on Newton Street. Six Government witnesses testified to the existence of the conspiracy and to appellants' participation in it: Kenneth Forgy, Jr., an associate of Mark Hoyle, who distributed drugs on Newton Street until his arrest in 1989; Lazaro Santa Cruz and Frank Lynch, lieutenants in the Newton Street Crew; William "Poopie" Woodfork, a member of appellants' clique; Cornelius "Googie" Wooten, a member of the Newton Street Crew distributing drugs on the 16th Street end of Newton Street; and Anthony Pratt, a former drug dealer turned informant. Several of these witnesses testified that Hoyle was the common source of drugs on Newton Street, tr. 7/16/93, at 28; that Hoyle, "the boss," managed the "business" on Newton Street, tr. 7/16/93, at 34; 7/20/93, at 60–61; that appellants sold crack supplied by Hoyle—Graham and Smith receiving from Hoyle directly and Terrell receiving his share from Graham, tr. 7/29/93, at 30; and that appellants either paid Hoyle upfront or after selling their share of drugs on the street, tr. 7/26/93, at 31–34. According to the Government's witnesses, appellants were members of one of the three cliques operating as part of the Newton Street Crew. Tr. 7/20/93, at 10–11, 13; 7/26/93, at 31; 7/29/93, at 25–29. Witnesses testified that although the cliques did not share profits with members of other cliques and sometimes competed with each other for sales, tr. 7/27/93, at 130–31, they all shared a common goal: selling Hoyle's cocaine for profit. *See, e.g.,* tr. 7/15/93, at 178–79 ("[T]here were different little cliques amongst one huge clique on Newton Street, but all of us got our drugs from [Hoyle]"). Hoyle supplied the cliques and all proceeds went to him. Tr. 7/29/93, at 41–43. Moreover, the cliques were interdependent. Participants served as police look-outs for other

cliques. Tr. 7/20/93, at 65. When one clique ran out of cocaine, buyers were sent to another clique to make a purchase. Tr. 7/16/93, at 38–39. Members of different cliques sometimes worked together to store, bag, and distribute cocaine. Tr. 7/16/93, at 38–39; 7/20/93, at 26–27; 7/30/93, at 33–35.

We have no doubt that this evidence was sufficient for a reasonable juror to conclude that appellants and others shared the common goal of distributing crack cocaine for profit and that the cliques were dependent on each other and on Hoyle. Because the evidence was sufficient, any variance from the indictment did not substantially prejudice the appellants. *See United States v. Childress,* 58 F.3d 693, 709–15 (D.C.Cir.1995) (finding no prejudicial variance where sufficient evidence existed of single conspiracy), *cert. denied,* —— U.S. ——, 116 S.Ct. 825, 133 L.Ed.2d 768 (1996); *Tarantino,* 846 F.2d at 1393–94 (analyzing variance under sufficiency standard).

■ Appellants argue that the district court improperly denied their request for a jury instruction on multiple conspiracies. Our rejection of appellants' insufficiency claim does not obviate the need to address this issue, for if record evidence supports the existence of multiple conspiracies, the district court should have so instructed the jury. *See Tarantino,* 846 F.2d at 1400 ("trial court ... required to instruct on the defendant's theory of the case if supported by the evidence"); *United States v. Shorter,* 54 F.3d 1248, 1256 (7th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 250, 133 L.Ed.2d 176 (1995). To convict, the jury must find appellants guilty of the conspiracy charged in the indictment, not some other, separate conspiracy.

Appellants requested the following instruction:

> In this case, the defendants contend that the government's proof fails to show the existence of the conspiracy charged in Count I of the indictment. Rather, they claim that if an agreement to distribute cocaine base existed then there were actually several different separate and independent conspiracies with various members, constituting multiple conspiracies.

> Proof of several separate and independent conspiracies is not necessarily proof of the conspiracy charged in the indictment, unless one or more of those conspiracies proved happens to be one of the conspiracies charged in the indictment. However, if you are satisfied that such a conspiracy existed then you must go further; you must determine who were the members of that conspiracy.

The district court refused to give this instruction because it found no evidence of a "different" conspiracy from that charged in the indictment. We think the district court was correct. If the evidence had shown that all three appellants did not conspire together, but that Graham was involved in a conspiracy with Santa Cruz or that Smith was involved in another separate conspiracy with Hoyle, then appellants' proposed instruction would have been necessary. But as the district court found, there was no such evidence. Rather, the evidence showed that appellants worked together and with Hoyle and others to distribute cocaine. Appellants' suggestion that the three cliques may have actually formed three separate conspiracies, even if supported by record evidence, would not help them; the evidence showed that appellants were part of the same clique, and thus part of the conspiracy charged in the indictment.

### FORGY'S TESTIMONY

■ Appellants argue that the district court violated Rule 404(b)'s restriction on prior bad acts evidence by admitting the testimony of Kenneth Forgy, a Government witness who testified to appellants' alleged criminal activity up to three years preceding the conspiracy of which appellants were indicted. Although forbidding evidence of other crimes or bad acts "to prove the character of a person in order to show action in conformity therewith," Rule 404(b) allows such evidence "for other purposes, such as proof of motive, ... intent, ... [or] knowledge." If relevant to other purposes, the evidence is admissible as long as its "probative value is [not] substantially outweighed by the danger of unfair prejudice." FED.R.EVID. 403; *see also United States v. Mitchell,* 49 F.3d 769, 775 (D.C.Cir.) (describing two-step analysis), *cert. denied,* —— U.S. ——, 116 S.Ct. 327, 133

L.Ed.2d 228 (1995). We review the district court's decision to admit "other crimes" evidence for abuse of discretion. *See United States v. Watson*, 894 F.2d 1345, 1349 (D.C.Cir.1990).

Forgy's testimony focused on the drug distribution activities on Newton Street from 1987, when he arrived there, until his arrest in late 1989. Forgy testified that beginning in 1987, he, Hoyle, Graham, and Terrell sold cocaine on Park Place in Mount Pleasant, tr. 7/14/93, at 76; that Hoyle "ran [the Park Place] group," *id.* at 78; that he and Hoyle moved to Newton Street after a dispute with others selling near Park Place, *id.* at 79–80; that he, Hoyle, Graham, Terrell, and others began distributing on Newton Street in about 1987, *id.* at 81–82; that Hoyle organized all the sellers on Newton Street, *id.* at 83, 87, 111; that Smith began working with Hoyle in 1989, *id.* at 88, 111–13; that the group, including appellants, sold on Newton Street every day, *id.* at 98–99; that Terrell and Graham worked together, *id.* at 111; and that Graham and Smith distributed drugs together, *id.* at 115. Although this testimony related to events taking place outside the indicted period, because it focused on the origin and scope of the Newton Street conspiracy in which appellants participated, it was relevant to establish the formation and contours of the conspiracy and to show appellants' knowledge of the conspiracy and their intent to join. *See United States v. Prevatte*, 16 F.3d 767, 776 (7th Cir.1994) (holding prior bad acts evidence admissible to "show the formation of the conspiracy or the prior relationship between conspirators"). Forgy's testimony was therefore admissible under Rule 404(b).

■■■■ The question then is whether Forgy's testimony was substantially more prejudicial than probative. Although the district court admitted the evidence, it failed to perform the Rule 403 balancing on the record. We do not reverse for failure to make such a balancing, however, " 'if the considerations germane to balancing probative value versus prejudicial effect are readily apparent from the record.' " *United States v. Manner*, 887 F.2d 317, 322 (D.C.Cir.1989) (quoting *United States v. Sutton*, 801 F.2d 1346, 1362

(D.C.Cir.1986)), *cert. denied*, 493 U.S. 1062, 110 S.Ct. 879, 107 L.Ed.2d 962 (1990). We think they are. The district court characterized the evidence as relevant to "the formation of the larger conspiracy which is the thrust of the government's case." Tr. 7/15/93, at 5–6. The district court also gave a limiting instruction, cautioning the jury to consider the evidence only to the extent that it related to the Government's theory "that on Newton Street there was a master conspiracy of which the conspiracy charged in this indictment is a part," not "to infer that because [appellants] may have done things between 1985 and 1990 they are, therefore, guilty of the offenses with which they stand charged under the indictment on trial here." Tr. 7/15/93, at 118. To us, these statements suggest that the district court found that the probative value of the evidence in establishing the contours of the conspiracy was not substantially outweighed by the risk that the jury would make inferences about appellants' propensity to commit the charged offenses. On the basis of these statements, together with our own review of Forgy's testimony, we find no abuse of discretion by the district court.

■■■■ Appellants have a second argument based on Forgy's testimony. Relying on *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), they claim the Government failed to disclose a deposition in which Forgy recounts his participation in several drug-related murders, as well as the results of a polygraph test in which he admitted committing two murders but allegedly gave several deceptive responses when asked about the involvement of others in the murders. Appellants say they would have used both the deposition and the polygraph to impeach Forgy. When a witness's credibility is determinative of guilt or innocence, such impeachment evidence is subject to *Brady's* disclosure requirements. *See Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). Under *Brady*, evidence is considered "material" and thus must be disclosed by the government if there is a reasonable probability—that is, a " 'probability sufficient to undermine confidence in the outcome' "—that "had the evidence been

**1474**

disclosed to the defense, the result of the proceedings would have been different." *United States v. Kelly,* 790 F.2d 130, 135–36 (D.C.Cir.1986) (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985) (Opinion of Blackmun, J.)). Federal Rule of Criminal Procedure 16(a)(1)(C) likewise requires disclosure of information "material to the preparation of the defendant's defense." Under Rule 16, evidence is material if "there is a strong indication that it will 'play an important role in uncovering admissible evidence, aiding witness preparation, . . . or assisting impeachment or rebuttal.'" *United States v. Lloyd,* 992 F.2d 348, 351 (D.C.Cir.1993) (quoting *United States v. George,* 786 F.Supp. 56, 58 (D.D.C.1992)). Although the materiality standard is "not a heavy burden," *id.* at 351, the Government need disclose Rule 16 material only if it " 'enable[s] the defendant significantly to alter the quantum of proof in his favor.'" *United States v. Caicedo–Llanos,* 960 F.2d 158, 164 n. 4 (D.C.Cir.1992) (quoting *United States v. Ross,* 511 F.2d 757, 763 (5th Cir.), *cert. denied,* 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975)).

We are not persuaded that the polygraph results would have significantly aided impeachment. As the district court found, Forgy "had already admitted to the deceptions in other contexts in the course of direct examination, and there is a limit to the number of deceptions which operate for impeachment." Tr. 8/2/93, at 63. Appellants have likewise failed to show what additional impeachment information they would have learned from the deposition. On direct examination, Forgy admitted that he had participated in three killings, including the two at issue in the deposition. Pleading guilty to having committed two, he was convicted at trial of the other. Tr. 7/14/93, at 67, 70. Defense counsel cross-examined Forgy extensively about the killings. Tr. 7/14/93, at 132–37, 142–44. Because the jury was well aware of Forgy's involvement in several killings and previous deceptions, we think it unlikely that any additional impeachment of Forgy would have significantly altered the quantum of proof in appellants' favor, much

less produced a different outcome. *Cf. United States v. Cuffie,* 80 F.3d 514, 518 (D.C.Cir. 1996) (impeachment evidence is cumulative "only if the witness was already impeached at trial by the same kind of evidence").

CONFRONTATION CLAUSE

■ Appellants claim that the district court restricted their cross-examination of Government witnesses in violation of the Confrontation Clause of the Sixth Amendment. *See Davis v. Alaska,* 415 U.S. 308, 315–17, 94 S.Ct. 1105, 1109–1111, 39 L.Ed.2d 347 (1974) (Constitution guarantees right to meaningful cross-examination). According to appellants, the district court limited the scope of cross-examination to the witnesses' immediately preceding testimony, rather than allowing appellants to cross-examine on issues raised by the witnesses in their earlier appearances. This ruling, appellants argue, prejudiced them by limiting cross-examination on questions of bias and motive.

■ District courts "enjoy[ ] wide discretion to control cross-examination." *Harbor Ins. Co. v. Schnabel Found. Co.,* 946 F.2d 930, 935 (D.C.Cir.1991), *cert. denied,* 504 U.S. 931, 112 S.Ct. 1996, 118 L.Ed.2d 592 (1992). Limits on cross-examination amount to an abuse of discretion only if they "result[ ] in prejudice to the substantial rights of the appellant." *Harbor Ins. Co.,* 946 F.2d at 935. Not every limitation on cross-examination violates the Confrontation Clause. Rather "violations are found primarily where defendants have been given *no* realistic opportunity to ferret out a potential source of bias" and are not found "so long as defense counsel is able to elicit enough information to allow a 'discriminat[ing] appraisal of the witness's motives and bias.'" *United States v. Derr,* 990 F.2d 1330, 1336 (D.C.Cir.1993) (alteration in the original) (quoting *United States v. Robinson,* 832 F.2d 366, 373 (7th Cir.1987), *cert. denied,* 486 U.S. 1010, 108 S.Ct. 1739, 100 L.Ed.2d 203 (1988)); *see also Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985) ("Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-ex-

amination that is effective in whatever way, and to whatever extent, the defense might wish.").

Applying these standards, we find no error in the district court's ruling. Because the Government presented its evidence count by count, two of the Government's central witnesses testified numerous times over fifteen days: Lazaro Santa Cruz testified seven times; William Woodfork testified five times. To limit repetitive examination, the district court ruled that for those Government witnesses who were to be recalled, cross-examination "should be deferred until the last appearance." Tr. 7/14/93, at 6. Accordingly, when Santa Cruz testified for the first time, the court ruled that appellants could not cross-examine him until later. Tr. 7/16/93, at 47. But when counsel objected that this would reduce the effectiveness of cross-examination, the judge allowed cross-examination after each of Santa Cruz's appearances, emphasizing that "I'm going to then restrict you rather severely with respect to his subsequent appearance, and I'm not going to let you replow ground that you have already covered." *Id.* at 49. The court continued: "Clearly, there are circumstances that could arise which would entitle you to reopen subjects that you had covered on the initial cross-examination. However, as a general proposition, you will be confined to the testimony that he gives on a subsequent appearance." *Id.* at 49–50. Several days later, the court allowed defense counsel a choice between cross-examining after each appearance or after the final appearance, emphasizing that if they decided to wait until the final appearance, they could still cross-examine with respect to all matters to which witnesses had testified. Tr. 7/19/93, at 17–19.

Quite obviously, the trial court did not, as appellants contend, restrict them to cross-examination only as to the witness's immediate past testimony. If appellants chose to cross-examine a witness after the final appearance, the district court allowed them to cross-examine with respect to the witness's entire testimony. Only if appellants chose to cross-examine after each appearance did the district court limit subsequent cross-examinations to the immediately preceding testimony. Ruling that repeated cross-examination on bias would be unnecessary and excessive was well within the district court's discretion. *See Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986) (district court may limit cross-examination "based on concerns about ... interrogation that is repetitive or only marginally relevant"). Although cross-examining Santa Cruz and Woodfork on motive and bias during each appearance might have marginally increased the jury's perception of these witnesses' credibility, we think the district court permitted defense counsel sufficient cross-examination to allow the jury a "discriminating appraisal of the witness's motives and bias."

### PRATT

■ Appellants claim that the Government allowed one of its witnesses, Anthony Pratt, to perjure himself about his motivation to testify. In support of this argument, they point to Pratt's testimony in an earlier case, claiming that it contradicts his testimony in this case. According to appellants, Pratt testified in the earlier trial, a murder case, that he had volunteered information to the police about the killing because he feared he would be implicated or harmed by the killer. When asked in this case why he stopped selling drugs, Pratt explained that though he was not a suspect, a killing had led him to stop selling drugs. Tr. 7/22/93, at 9. Explaining that he became a cooperating witness in this case because he was "just trying to do some kind of good," he testified that he had "sold drugs for three years, and it took a killing for me to open my eyes and see where my life was really going and what I was doing to the community that was around me." Tr. 7/22/93, at 52–53. We see no conflict between Pratt's testimony in the two trials. He simply gave different answers to different questions. At the first trial, Pratt explained why he testified against the accused killer; at this trial he explained why he stopped selling drugs and why he became a cooperating witness against the Newton Street Crew. Pratt's statements thus do not constitute perjury.

GRAHAM'S AGE

■ The final challenge to the jury's verdict comes from Appellant Perry Graham. He claims that the Government failed to present sufficient evidence of his age to charge him under 21 U.S.C. § 861, which makes it a crime for any person at least 18 years old to use persons under 18 in drug trafficking. But Forgy testified that he grew up with Graham, tr. 7/14/93, at 74, and that Graham was "about 22, 23," *id.* at 142. Viewed in the light most favorable to the Government, this testimony is sufficient for a "rational trier of fact" to have found beyond a reasonable doubt that Graham was at least 18 years of age.

## III.

We turn next to appellants' challenges to their sentences. Their central claim is that the district court erred in determining the amount of drugs each appellant had distributed.

Under the Sentencing Guidelines for drug trafficking offenses, a sentence's length depends in large part on the quantity of drugs the defendant distributed. As we have explained, "the base offense level is determined by the amount of drugs involved in the 'relevant conduct'—the greater the quantity, the higher the base level." *United States v. Anderson,* 39 F.3d 331, 351 (D.C.Cir.1994), *on reh'g in part,* 59 F.3d 1323 (D.C.Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 542, 133 L.Ed.2d 445 (1995). "Relevant conduct" is defined in the guidelines as "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant ... that occurred during the commission of the offense of conviction, [or] in preparation for that offense...." U.S.S.G. § 1B1.3(a)(1) (Nov. 1993). Under the guidelines in effect at the time of appellants' sentencing, distribution of amounts greater than 15 kilograms produced a base level of forty-two, carrying a sentence of thirty years to life. *See* U.S.S.G. § 2D1.1(c) (Nov. 1993); U.S.S.G. Ch. 5, Pt. A (Nov. 1993).

According to the presentence report in this case, Graham personally distributed 21.9 kilograms between 1988 and 1992. The report held him accountable for an additional 20.5 kilograms distributed by Smith and Lynch, for a total of 42 kilograms. The presentence report charged Terrell with 34.9 kilograms during the period from 1989 through 1992, representing the total of the amount that he sold himself and the amount that he assisted in packaging for distribution, distributed, or reasonably foresaw the distribution of by Lynch and appellant Graham. The presentence report attributed 8.1 kilograms to Smith plus 34.9 kilograms in furtherance of the conspiracy, for a total "in excess of 42 kilograms." Based on each defendant's distribution of more than 15 kilograms of crack, their criminal offense category of one (none of the appellants had prior adult convictions), and three level upward adjustments for their roles as managers or supervisors of drug distribution, the presentence report recommended mandatory life sentences for all three.

Each defendant submitted written objections to the court arguing that no record support existed for many of the presentence report's claims. In response, the Government submitted a memorandum, providing specific citations to the record to support the presentence report's quantity determinations. At the presentencing hearing, after "review[ing] the submission of all parties with respect to the calculations of quantities of contraband distributed or attributed to these defendants by the presentence report writers," the district court found each defendant responsible for distributing at least the 15 kilograms required to impose a life sentence. Tr. 12/13/93, at 2. Graham and Terrell, the court stated, were responsible personally for distributing at least 15 kilograms. As to Smith, the district court found that although the presentence report did not establish that he had distributed 15 kilograms personally, the distribution activities of the codefendants could be attributed to him as relevant conduct. *Id.* at 3. Claiming that they did not have sufficient time to respond to the Government's Memorandum, defendants repeated their objections to the presentence report's quantity determinations. *See, e.g., id.,* at 5, 8, 10, 20–24, 26. The district court rejected defendants' claims,

stating that it "ha[d] made the findings that [it had] heretofore indicated that [it] intended to make and the objections to the presentence report are denied." *Id.* at 35.

We begin with appellants' claim that the district court violated Federal Rule of Criminal Procedure 32 by failing to resolve their challenges to the information contained in the presentence report. Rule 32(c)(1) requires that when defendants allege any factual inaccuracy in the presentence report, the court should either make a finding resolving the controverted matter or determine that it will not consider the controverted matter in sentencing the defendant. Rule 32 also directs the district court to reduce its findings to writing and attach them to the presentence report. Rule 32's requirement serves more than the purely ministerial function of "furnish[ing] accurate information to the Bureau of Prisons and the Parole Commission," *United States v. Chaikin,* 960 F.2d 171, 175 (D.C.Cir.1992); it "protect[s] a defendant's due process rights to be sentenced on the basis of accurate information," *id.* (quoting *United States v. Hanono–Surujun,* 914 F.2d 15, 20 (1st Cir.1990) (in turn quoting *United States v. Bruckman,* 874 F.2d 57, 63–64 (1st Cir.1989))) (internal quotation marks omitted), and facilitates appellate review by furnishing a "clear record of the resolution of disputed facts," *United States v. Smith,* 844 F.2d 203, 206 (5th Cir.1988). *See also United States v. Alvarado,* 909 F.2d 1443, 1445 (10th Cir.1990) (findings necessary for appellate court to know upon which facts district court relied). Although remanding for resentencing is unwarranted for "every failure of literal compliance with Rule 32," we have held that remand is appropriate where the district court fails to make even oral findings on a "serious and potentially pivotal sentencing factor." *Chaikin,* 960 F.2d at 175 (noting that remand may not be necessary where district court has met "substantive requirements of Rule 32" but has failed to perform the ministerial task of appending its findings to the presentence report).

Conceding that the district court failed to make express findings on the matters raised by appellants, the Government argues that the district court made implicit findings by stating, after hearing appellants' objections, that it was adopting the presentence report. Under the circumstances of this case, we find the district court's response entirely inadequate. Appellants' objections to the presentence report quantity determinations are serious matters. If appellants are correct and if the quantities attributable to them are significantly less, their sentences could be reduced from life to 30 years. Determining the quantity of drugs that appellants sold required culling together statements from several witnesses who testified during the course of a fairly long trial. Yet the presentence report contained absolutely no citations to the trial transcript to support its quantity calculations. Because appellants claim that insufficient record support existed for these calculations, we fail to see how simply adopting a presentence report, itself void of any detail, could constitute a "finding" on appellants' claims. Rule 32 requires more than the district court's statement that it "ha[d] made the findings that I have heretofore indicated that I intended to make."

The absence of detail and clarity in the presentence report distinguishes this case from cases relied on by the Government in which adoption of the presentence report was found to satisfy Rule 32. Unlike those cases, the facts here are not "determinable from a PSR that the court has adopted by reference," *United States v. Sherbak,* 950 F.2d 1095, 1099 (5th Cir.1992), nor are the "findings in the PSR ... so clear that the reviewing court is not left to 'second-guess' the basis for the sentencing decision," *United States v. Carreon,* 11 F.3d 1225, 1231 (5th Cir.1994) (citation omitted). Instead, "[w]hen faced with specific allegations of factual inaccuracy by the defendant, the court cannot satisfy Rule 32 ... by simply stating that it adopts the factual findings and guideline application in the presentence report." *United States v. Pedraza,* 27 F.3d 1515, 1530 (10th Cir.) (citation omitted), *cert. denied,* — U.S. —, 115 S.Ct. 347, 130 L.Ed.2d 303 *and* — U.S. —, 115 S.Ct. 520, 130 L.Ed.2d 425 (1994); *see also United States v. Roederer,* 11 F.3d 973, 980–81 (10th Cir.1993) (district court's cursory adoption of findings in presentence report was insufficient to satisfy Rule 32's requirements). Al-

though the district court also had before it the Government's Memorandum which includes more detailed support from the trial transcript, we cannot tell from the record whether the district court relied on the Memorandum in determining the sentences. Because appellants made specific challenges to the Government's Memorandum, the district court should have made explicit written findings that it had resolved each matter by adopting the Government's Memorandum, if indeed that is what it did.

According to the Government, any failure to comply with Rule 32 was harmless because appellants' objections were without merit. We disagree. Where "serious and potentially pivotal sentencing factor[s]" are involved, we have directed the district courts to enter written findings to facilitate appellate review of the sentences. *Chaikin,* 960 F.2d at 175. In this case, because of the sheer number of allegations of factual inaccuracy and the substantial size of the record, we find it particularly difficult, if not impossible, to exercise our appellate responsibilities without district court findings on disputed matters.

Inaccuracies and inconsistencies in both the presentence report and the Government's Memorandum heighten our concern about the absence of findings—particularly as to the quantities ascribed to Smith and Terrell. For example, although the presentence report states that in 1989 Smith sold cocaine on a daily basis, it alleges no specific amounts. The report then says that in 1990, Smith worked with Graham to distribute 4.5 kilograms, again stating that in 1990 Smith *personally* distributed 4.5 kilograms. Whether Smith's "personal" distribution is a separate amount from that distributed with Graham is not at all clear; did Smith sell 4.5 kilograms in 1990, or nine kilograms? For 1991, according to the presentence report, Smith distributed 0.5 kilogram. Yet the report concludes that Smith was personally responsible for distributing 8.1 kilograms. From the numbers provided in the presentence report itself, we cannot discern how the presentence report writers arrived at 8.1 kilograms.

The Government's Memorandum compounds the confusion. Although the presentence report gave no distribution amounts for 1989, the Government's Memorandum states that Smith distributed 3 to 4 ounces a week in 1989 for a total of 4.5 kilograms. At oral argument, the Government told us that the presentence report was incorrect and that one of the amounts listed for 1990 in the presentence report should have been listed for 1989 instead. This conflict between the presentence report and the Government's Memorandum is precisely the type of issue the district court should have resolved through written findings.

Smith's challenges to the amounts the Government claims he sold in 1989 provide another example of the need for district court findings. Although the Government's Memorandum states that Smith sold about three ounces a week in 1989, it cites as support only testimony that Graham sold that amount. Smith claims that no witness testified that he sold that amount. Furthermore, Smith argues, the Government's Memorandum at least doubles the amount of crack for which he is responsible. According to Smith, the Memorandum erroneously assumes that Smith sold drugs throughout 1989, even though testimony indicates that he only began selling drugs on Newton Street in the summer. *See* 7/20/93, at 142 (Woodfork testimony).

The presentence report and the Memorandum attribute to Smith an additional 34.9 kilograms distributed by others in furtherance of the conspiracy: 21.9 kilograms distributed by Graham and 13 kilograms distributed by Lynch. According to Smith, neither the presentence report nor the Government's Memorandum offers record support for the conclusion that Smith reasonably foresaw the distribution of 21 kilograms by Graham. *Cf. Childress,* 58 F.3d at 723 (trial court must make individualized findings that the quantity of drugs attributed to defendant was reasonably foreseeable to him). The Memorandum attributes all of Graham's drug sales to Smith, citing testimony that Smith accompanied Graham's runner (Woodfork) to retrieve a "stash" of one-half ounce amounts of crack left there by Hoyle for Graham and Smith, which, according to the record, may only have happened once. Tr. 7/20/93, at 166.

A final example of a factual dispute requiring resolution is Smith and Terrell's challenge to the attribution to them of 13 kilograms distributed by Lynch. To support the 13 kilograms, the presentence report and the Government's Memorandum state that Smith and Terrell helped Lynch cut and package for distribution one-eighth kilo of crack supplied by Hoyle each week from 1990 through July 1992. Lynch's testimony, which the Memorandum cites as support, was as follows:

Q: And from July of 1990 through July of 1992 how much crack would you get from Mark Hoyle a week?

A: I would say an eighth, an eighth of a [kilogram].

. . . . .

Q: And what would you do with it?

A: I would cut it up.

. . . . .

Q: Did you *ever* have other people help you cut [it] up?

A: Yes.

Q: Who?

A: Terrence Terrell and Roger Smith.

Tr. 7/29/93, at 44 (emphasis added). By itself, this testimony does not support the conclusion that Smith and Terrell were always, or even usually, present when Lynch cut the cocaine. Again, the district court should have made specific findings on whether this testimony adequately supported the attribution of 13 kilograms to Smith and Terrell, or whether other evidence existed in the record to support the 13 kilogram amount.

In addition to the district court's failure to make Rule 32 findings, we agree with appellants that the district court failed to make individualized findings that the amounts of drugs attributed to each appellant as part of the conspiracy were within the scope of that appellant's agreement. When determining relevant conduct, we have repeatedly emphasized that the sentencing judge should not automatically hold each defendant accountable for the total amount of cocaine involved in the conspiracy, but must instead make individualized findings as to the specific amount of drugs "each appellant might have reasonably foreseen his or her agreed-upon participation would involve." *Anderson,* 39 F.3d at 353 (remanding for resentencing). Recognizing that findings are necessary "to ensure careful adherence to ... limitations on co-conspiratorial liability," *Childress,* 58 F.3d at 722, we have not hesitated to remand for resentencing when the district court has failed to make these individualized findings. *See, e.g., Childress,* 58 F.3d at 722–24; *United States v. Edmond,* 52 F.3d 1080, 1103–06 (D.C.Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 539, 133 L.Ed.2d 443 (1995); *Anderson,* 39 F.3d at 353; *United States v. Saro,* 24 F.3d 283, 291–92 (D.C.Cir.1994); *United States v. Perkins,* 963 F.2d 1523, 1528 (D.C.Cir.1992); *Lam Kwong–Wah,* 924 F.2d at 307. That a jury has convicted defendants of participating in a single conspiracy does not eliminate the need for individualized findings. As we explained in *Childress,*

[s]uch a verdict speaks to the scope of the defendant's agreement only in very general terms: It does not address the question of which specific actions demonstrated at trial were in furtherance of that single conspiracy or were foreseeable to the conspirators. And it is only these actions that may form the predicate for the defendants' sentences.

58 F.3d at 722. Conclusory statements by the district court that the quantity of drugs attributed to the defendant were reasonably foreseeable to the defendant do not satisfy the individualized finding requirement. The district court must explicitly " 'set[ ] forth the reasons why the particular amount of drugs was reasonably foreseeable to him, with reference to the evidence before the court.' " *Id.* at 723 (quoting *United States v. Edwards,* 945 F.2d 1387, 1399 (7th Cir.1991)) (alteration in the original), *cert. denied,* 503 U.S. 973, 112 S.Ct. 1590, 118 L.Ed.2d 308 (1992).

At the presentencing hearing, both the Government and defendants asked the district court to "make individual findings with respect to the defendants that the amounts attributed to them were within the scope of the agreement that each one entered into." Tr. 12/13/93, at 23–24, 30. In response, the

district court said it "had made that," presumably referring to its initial finding that each defendant's relevant conduct was about 15 kilograms. Apparently conceding that the district court did not make the requisite individualized findings, the Government now argues that findings were not necessary because the district court adopted the presentence report which, according to the Government, contained particularized findings.

Even if adopting the presentence report could satisfy the requirement of individualized findings in some cases, it cannot do so here. Although the Government is correct that, unlike in some of our recent conspiracy cases, the presentence report here makes some effort to define the scope of each appellant's agreement and the amount of drugs that was reasonably foreseeable to each appellant, the presentence report fails, in several instances, to " 'set[ ] forth the reasons why the particular amount of drugs was reasonably foreseeable to [the defendant], with reference to the evidence....' " *Childress*, 58 F.3d at 723 (quoting *Edwards*, 945 F.2d at 1399) (first alteration in original); *see also id.* at 724 ("The district court may not simply *assert* reasonable foreseeability: It must articulate specific findings in support of its determination ..."). Neither the presentence report nor the Government's Memorandum specifies why Smith was responsible for all of the drugs distributed by Graham. In fact, according to the evidence, Smith could not have agreed to or foreseen all of Graham's distribution activities since some of these activities took place in 1988, before Smith began selling on Newton Street. The Memorandum and the presentence report also attribute 21.9 kilograms personally distributed by Graham to Terrell. Although both documents describe significant cooperation between Terrell and Graham, neither specifies whether the entire amount sold by Graham was within the scope of the Graham–Terrell agreement and reasonably foreseeable by Terrell. Indeed, the Government's Memorandum points to numerous instances in which Graham used other runners to distribute drugs, sold the drugs himself, or distributed the drugs to other lieutenants.

The Government's Memorandum also holds Graham responsible for 20.5 kilograms distributed by Smith and Lynch in furtherance of the conspiracy. Again, although asserting in a conclusory fashion that this amount was reasonably foreseeable, the Memorandum points only to testimony that Smith, Lynch, and Graham were in the same clique, utterly failing to explain which of Smith and Lynch's distribution activities it is attributing to Graham or whether these amounts were foreseeable and within the scope of Graham's agreement.

We vacate the sentences and remand to the district court to make Rule 32 findings as well as findings on the scope of the conspiratorial agreement entered into by each appellant and the amount of drugs reasonably foreseeable to that appellant. Although we have focussed our attention primarily on the claims raised by Smith and Terrell, we believe that remand of Graham's sentence is necessary as well. Like the other two appellants, Graham alleges factual inaccuracies in the presentence report and "absent a statement of findings, we cannot determine whether the [c]ourt relied on inaccurate or unreliable facts." *Chaikin*, 960 F.2d at 176. Remand will further Rule 32's objectives. It will aid appellate review and ensure that all defendants are sentenced on the basis of accurate information.

## IV.

In addition to his claims that the district court failed to make proper findings, Terrell mounts several separate challenges to his sentence. He begins by arguing that the district court failed to realize that it could depart downward based on his unusual vulnerability to prison abuse. Although no specific guideline allows for departure on this basis, Terrell claims the district court could have departed pursuant to 18 U.S.C. § 3553(b), which permits sentencing courts to depart downward to address circumstances "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission." Whether the Sentencing Commission considered extreme vulnerability to prison abuse in formulating the guidelines is a question we review *de*

*novo. See United States v. Mason*, 966 F.2d 1488, 1494 (D.C.Cir.), *cert. denied*, 506 U.S. 1040, 113 S.Ct. 829, 121 L.Ed.2d 699 (1992).

Section 3553(b) permits sentencing courts to consider characteristics of the defendant, even those unrelated to the defendant's blameworthiness for the crime. *See United States v. Smith*, 27 F.3d 649, 651–53 (D.C.Cir.1994). Relying on § 3553(b), other circuits have held that a sentencing court may depart for *extreme* vulnerability to abuse in prison. *See United States v. Maddox*, 48 F.3d 791, 797–98 (4th Cir.1995) (holding that departure may be based on extraordinary vulnerability, but finding facts insufficient to warrant departure); *United States v. Tucker*, 986 F.2d 278, 280 (8th Cir.) (stating that "the potential for victimization can provide a proper predicate for a departure" but finding that defendant's case was not "outside the perimeters of the ordinary case"), *cert. denied*, —— U.S. ——, 114 S.Ct. 76, 126 L.Ed.2d 44 (1993); *United States v. Lara*, 905 F.2d 599, 601 (2nd Cir. 1990) (sustaining departure where defendant's "diminutive size, immature appearance and bisexual orientation" made him a "potential [candidate] for victimization"). These decisions rest on the proposition that defendants subjected to repeated physical or sexual assault are, in effect, punished more severely than others. *See, e.g., Lara*, 905 F.2d at 603. Although this circuit has not addressed whether extreme vulnerability is a proper basis for departure, in holding that departure is permissible for "matters unconnected to blameworthiness," we have taken approving notice of the "extreme vulnerability" line of cases. *Smith*, 27 F.3d at 653. In *Smith*, we allowed downward departure because of a defendant's status as a deportable alien, recognizing that because such aliens were ineligible for spending the last 10% of their sentences in community-based confinement and could not be assigned to minimum security prisons, *id.* at 651, a defendant's deportable alien status would "substantial[ly] ... affect the severity of his confinement," *id.* at 655.

 Reviewing the guidelines ourselves, we find that although the Commission considered a defendant's "mental and emotional condition," 28 U.S.C. § 994(d)(4), and the "nature and capacity of the penal [or] correctional" institution in formulating the guidelines, *see* 28 U.S.C. § 994(g), it did not consider extreme vulnerability to physical or sexual abuse. We therefore join our sister circuits and hold that extreme vulnerability to assault in prison may be a ground for departure. We emphasize that, to qualify for a downward departure, a defendant's vulnerability must be so extreme as to substantially affect the severity of confinement, such as where only solitary confinement can protect the defendant from abuse. *See Lara*, 905 F.2d at 602–03.

In the case before us, the district court appeared to agree that Terrell was "very vulnerable" to abuse in the prison system. Tr. 12/20/93, at 3. Acknowledging the Second Circuit's *Lara* decision, the district court nevertheless stated: "unfortunately I am not aware of [vulnerability to prison abuse] being a ground for departure." Tr. 12/20/93, at 3–4. Although the district court's statements are not entirely clear, the court seems to have thought that it lacked the authority to downward depart based on Terrell's vulnerability. *See United States v. Pinnick*, 47 F.3d 434, 439 (D.C.Cir.1995) (holding that appellate courts may review a district court's refusal to depart if the district court has misconstrued its authority, but not the "[district] court's discretionary decision that the particular circumstances of a given case do not warrant a departure"). On remand, the district court should therefore determine whether Terrell's vulnerability and potential for abuse are so extreme as to warrant downward departure.

Terrell raises two final challenges to his sentence: that the district court erred in refusing to downward adjust and that it improperly enhanced his sentence. As to these issues, we review the district court's factual findings under the "clearly erroneous" standard, granting " 'due deference to the district court's application of the guidelines to the facts.' " *See United States v. Kim*, 23 F.3d 513, 517 (D.C.Cir.1994) (quoting 18 U.S.C. § 3742(e)(4) (1988)).

According to Terrell, the district court should have granted a two-level downward adjustment because he was only a "minor" participant—"any participant who is less culpable than most other participants...." U.S.S.G. § 3B1.2(b) & comment. (n. 3). As we read the record, however, Terrell was not just a "lookout." He sold drugs directly to customers, *see* tr. 7/30/93, at 52–54, 129–30; 7/29/93, at 29–30, and "sometimes" played the role of lieutenant, supervising runners, tr. 7/20/93, at 61. We find no error in the district court's refusal to grant Terrell a downward adjustment.

Terrell argues that insufficient evidence exists for enhancing his sentence pursuant to U.S.S.G. § 3B1.1(b), which allows the district court to increase a defendant's base offense level by three levels if it finds that the defendant was a "manager or a supervisor" of a "criminal activity [that] involved five or more participants or was otherwise extensive." Terrell claims that the evidence shows only that he was a low-level dealer who did not in any way manage the affairs of the conspiracy or supervise others. The Government maintains that Terrell, though a runner himself, occasionally supervised other runners and sometimes played the role of "lieutenant." Reviewing the record ourselves, we think whether the evidence was sufficient to support upward enhancement is a close question. *Cf. United States v. Thompson,* 944 F.2d 1331, 1348–50 (7th Cir.1991) ("One's status as a middleman in a drug distribution chain does not, standing alone, make one a manager or supervisor."), *cert. denied,* 502 U.S. 1097, 112 S.Ct. 1177, 117 L.Ed.2d 422 (1992). In order to clarify this issue, and since we are remanding for other reasons, we ask the district court to make findings on this issue.

## V.

Because we are remanding for resentencing, we need not reach appellants' arguments that the district court erred in refusing to grant them an evidentiary hearing to resolve their sentencing claims and that, in making findings on the amounts of drugs each appellant had distributed, the court misconstrued the preponderance of the evidence standard of proof. Nor need we reach Graham and Terrell's claim that the district court erred by taking into account quantities of drugs distributed by them in 1988 and 1989, before the period of time for which they were indicted, or Terrell's separate argument that he was held responsible for amounts of cocaine distributed before he became eighteen on August 27, 1989. Under the version of the Sentencing Guidelines now in effect, 15 kilograms no longer requires a base offense level of forty-two. *See United States v. Clark,* 8 F.3d 839, 844 (D.C.Cir.1993) (resentencing occurs under version of Sentencing Guidelines in effect at time of resentencing unless this would violate ex post facto clause). If the district court finds on remand that appellants have distributed 1.5 kilograms or more, appellants will receive a base offense level of thirty-eight. *See* U.S.S.G. § 2D1.1(c)(1).

We affirm appellants' convictions. We vacate appellants' sentences and remand to the district court to resolve appellants' factual challenges to the presentence report and for particularized findings regarding the amount of crack cocaine attributable to each appellant. We also remand for the district court to consider whether Terrell was entitled to downward departure for extraordinary vulnerability to abuse in prison and to explain the basis for enhancing Terrell's sentence.

*So ordered.*